# AMERICAN SECURITY COUNCIL EDUCATION FOUNDATION, Petitioner,

### v.

## FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

### CBS Inc., Intervenor.

### No. 77–1443.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 21, 1978.

Decided June 29, 1979.

Robert J. Buenzle, with whom Robert E. Manuel, Washington, D. C., was on brief, for petitioner.

Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., with whom J. Clay Smith, Jr., Acting Gen. Counsel, James H. Kizziar, Jr., Counsel, F. C. C., and Bruce E. Fein, Attorney, Dept. of Justice, Washington, D. C., were on brief, for respondents.

J. Roger Wollenberg, Washington, D. C., with whom Donald C. Langvoort, was on brief, Stephen A. Weiswasser and Roger M. Witten, Washington, D. C., for intervenor.

Barry Grossman and Susan J. Atkinson, Attys., Dept. of Justice, Washington, D. C., for respondent United States.

J. Tullos Wells, Werner K. Hartenberger, and Gregory M. Christopher, Attys., F. C. C. Washington, D. C., for respondent F. C. C.

Before WRIGHT, Chief Judge, and BAZELON, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

Opinion for the court filed by TAMM, Circuit Judge.

Concurring Opinion filed by J. SKELLY WRIGHT, Chief Judge.

Concurring Opinion filed by BAZELON, Circuit Judge.

Dissenting Opinion filed by WILKEY, Circuit Judge, with whom MacKINNON and ROBB, Circuit Judges, join.

1. At the time of the study, American Security Council Education Foundation (ASCEF) was known as the Institute for American Strategy.

2. See note 3 infra.

3. The "content" and "viewpoint" analyses of CBS Evening News during 1972 formed the core of ASCEF's fairness doctrine complaint. See Joint Appendix (J.A.) at 8–13. In 1974, ASCEF published a report of its study, written by Dr. Ernest W. Lefever, called TV and National Defense, An Analysis of CBS News, 1972–1973 (TV and National Defense). The report was incorporated by reference into the complaint filed with the Federal Communications Commission (Commission). J.A. at 2. Chapter four of the report describes the rele-

TAMM, Circuit Judge:

We are called upon to decide whether the American Security Council Education Foundation (ASCEF) presented prima facie evidence that CBS, Inc. (CBS) violated the fairness doctrine by giving imbalanced coverage to "national security issues" in its news programming. The Federal Communications Commission (Commission) concluded that because ASCEF did not base its complaint on a particular, well-defined issue, it did not present prima facie evidence of a fairness doctrine violation. We uphold the Commission's decision.

I.

In 1972, ASCEF[1] launched a study to analyze the national television networks' coverage of issues relating to this country's national security. ASCEF originally planned to examine the news programs of all three national networks, but later decided, "in the interests of depth and thoroughness," to examine only one. E. Lefever, TV and National Defense, An Analysis of CBS News, 1972–73, at vi (1974) (TV and National Defense).[2] ASCEF chose CBS because CBS had the largest audience for evening news and the largest number of affiliated stations. Id.

ASCEF examined videotapes of all CBS Evening News broadcasts aired during 1972.[3] It transcribed broadcasts of all news reports that it determined were relevant to four topics:[4] United States military and

vant methodology. The methodology is commented on in S. Simmons, The Fairness Doctrine and The Media 207–08 (1978) and F. Friendly, The Good Guys, the Bad Guys and the First Amendment 167–91 (1975).

4. These topics replaced nine topics originally identified by ASCEF as relevant to national security: (1) United States military posture; (2) United States national strength; (3) United States internal security; (4) Soviet Union: military; (5) Soviet Union: non-military; (6) China: military; (7) China: non-military; (8) Southeast Asia; and (9) other foreign relations. See TV and National Defense at 74–76. ASCEF decided that the nine topics constituted a "broad and somewhat diffuse definition of na-

foreign affairs; Soviet Union military and foreign policy; China military and foreign policy; and Vietnam affairs. ASCEF submitted examples of the broadcasts it transcribed to the Commission, which included, *inter alia,* news reports of President Nixon's remarks and congressional debate on the Strategic Arms Limitations Treaty (SALT); Defense Secretary Laird's and various Senators' statements on the defense budget; Administration and congressional statements concerning the Trident submarine system and the B–1 bomber; the Democratic Party platform on amnesty for draft evaders; Soviet Union involvement in the Middle East; presidential campaign statements of Senator McGovern concerning, among other things, the defense budget, the space shuttle, and troops in Western Europe, South Korea and Indochina; the President's trip to China; the Vietnam War; and the activities of Chinese school children.[5]

ASCEF dissected the transcribed news reports[6] into sentences and categorized each sentence into one of three basic positions on national security:

*Viewpoint A* holds that the threat to U.S. security is more serious than perceived by the government or that the United States ought to *increase* its national security efforts;

*Viewpoint B* holds that present government threat perception is essentially correct or U.S. military and foreign policy efforts are adequate[;] and

*Viewpoint C* holds that the threat to U.S. security is less serious than perceived by the government or that U.S. national security efforts should be *decreased.*

TV and National Defense at 78 (emphasis in original).[7] Using this methodology, ASCEF concluded that 3.54 per cent of the sentences transcribed reflected viewpoint A, 34.63 per cent reflected viewpoint B, and 61.83 per cent reflected viewpoint C.[3] ASCEF filed a fairness doctrine complaint with the Commission against CBS based upon these statistics. In its complaint, AS-CEF also alleged that it reviewed CBS's news programming other than CBS Evening News for 1972, as well as CBS's news programming for 1973 and parts of 1975 and 1976, and observed the same disproportionate treatment of national security issues.[9] On the basis of its findings, ASCEF contended that CBS had engaged in advoca-

---

tional security," which caused "persistent coding problems." *Id.* at 76. ASCEF believed that the four topics it substituted for the nine bore "more directly on U.S. defense and foreign policy." *Id.*

5. *See id.* at 81–92. Although the report of the study did not contain a comprehensive list of the broadcasts transcribed, it gave examples. The majority of examples were derived from broadcasts during June 1972. ASCEF reproduced in its report forty of the fifty-nine sentences broadcast that month that it had determined were relevant to national security. AS-CEF excluded from its examples the nineteen sentences broadcast on June 15. *See id.* at 81. For a critical discussion of ASCEF's decision to eliminate these broadcasts from its examples, *see* Friendly, *supra* note 3, at 178–79.

6. ASCEF stated that it eliminated from its study news reports that, in its judgment, did not contain explicitly expressed opinions. *See* TV and National Defense at 76. ASCEF explained, for example, that it did not include news reports of events such as casualty and battlefield reports from the Vietnam war. *Id.* at 76–77. From the 1,396 broadcasts of separate news items originally transcribed, 274 sur-

vived this screening. The 274 news items were comprised of 2,235 sentences. According to ASCEF, CBS news staff expressed their own opinions in 416 of the 2,235 sentences. *Id.* at 77, 85–86, 95.

7. Viewpoint B, by ASCEF's definition, "is an opinion that supports the current policy and declared objectives of the U.S. Government." *Id.* at 90. ASCEF categorized any statement by an Administration official as Viewpoint B regardless of its content. Thus, Defense Secretary Laird's statement that he could not support agreement on SALT unless Congress acted to "improve our strategic offensive systems" thereby enabling the United States to "bargain from a strong position" was labeled as Viewpoint B, doing the *same* for national security, rather than Viewpoint A, doing *more* for national security. *See id.* at 83.

8. *See id.* at 85–86.

9. J.A. at 10–13. ASCEF apparently did not subject this programming to the same "viewpoint" analysis applied to CBS Evening News broadcasts aired during 1972.

cy journalism on "basic national security issues." [10] ASCEF asked the Commission to find the existence of a fairness doctrine violation and order CBS to provide a reasonable opportunity for the expression of A viewpoints.[11]

## II

The fairness doctrine provides the framework for insuring that the American broadcast system is operated in the public interest. From its inception, the doctrine's goal has been to promote the "paramount right of the public in a free society to be informed and to have presented to it for acceptance or rejection the different attitudes and viewpoints concerning [the] vital and often controversial issues which are held by various groups which make up the community." *Report on Editorializing by Broadcast Licensees*, 13 F.C.C. 1246, 1249

10. *Id.* at 19.

11. ASCEF specifically asked that the Commission order CBS to provide a reasonable opportunity for the presentation of the following views:
 a. The Soviet Union still has the objective of eventual world domination.
 b. The Soviet Union is militarily superior to the United States.
 c. The United States should be militarily superior to the Soviet Union.
 d. The United States should have the objective of winning the conflict between the two systems.
 *Id.* at 21.

12. *See* Fairness Report, 48 F.C.C.2d 1, 7 (1974); Applicability of Fairness Doctrine in Handling Controversial Issues of Public Importance (Fairness Primer), 40 F.C.C. 598, 599, 607 (1964).
 The fairness doctrine was developed by the Commission based on the public interest standard of the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U.S.C. §§ 151–609 (1976). *See, e. g.*, 47 U.S.C. §§ 303(f); 307(a), (d); 309(a). In *FCC v. National Citizens Comm. for Broadcasting*, 436 U.S. 775, 795, 98 S.Ct. 2096, 2112, 56 L.Ed.2d 697 (1978), the Supreme Court stated that the public interest standard in the law of broadcasting " 'necessarily invites reference to First Amendment principles' " most notably the goal of achieving " 'the widest possible dissemination of information from diverse and antagonistic sources.' " (quoting *Columbia Broadcasting Sys. v. Democratic Nat'l Comm.*, 412 U.S. 94, 122, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) and *Associated*

(1949); *see Fairness Report*, 48 F.C.C.2d 1, 5 (1974); *see also Democratic National Committee v. FCC*, 148 U.S.App.D.C. 383, 402, 460 F.2d 891, 910, *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972); *Green v. FCC*, 144 U.S.App.D.C. 353, 363, 447 F.2d 323, 333 (1971) (quoting *Retail Store Employees Union v. FCC*, 141 U.S.App.D.C. 94, 103, 436 F.2d 248, 257 (1970)). The fairness doctrine achieves its goal through imposing a two-fold requirement on broadcasters. It requires each broadcaster to (1) devote a reasonable percentage of its broadcast time to coverage of controversial issues of public importance, and (2) provide a reasonable opportunity for the presentation of conflicting views on such issues.[12]

The Supreme Court upheld the constitutionality of the fairness doctrine,[13] despite the general first amendment prohibition on

*Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed.2d 13 (1945)).
 The Federal Communications Commission had given the doctrine firm content by 1949. *See* Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1257–58 (1949). *See generally* Simmons, *Fairness Doctrine: The Early History*, 29 Fed.Com.B.J. 207, 242–44 (1976). In 1959, Congress confirmed the Commission's view that the fairness doctrine was part of the public interest standard. *See* Pub. L.No. 86–274, § 1, 73 Stat. 557 (1959). That year, Congress amended the "equal time" provision, 47 U.S.C. § 315(a) (1976), to provide that:
 > Nothing in the foregoing sentence [exempting certain news programming from the equal time requirement for qualified candidate broadcasts] shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

13. The Court upheld the "personal attack" and "political editorial" components of the fairness doctrine. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 373–75, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The Commission's current personal attack and political editorial rules appear at 43 Fed.Reg. 45856 (1978). *See generally* Simmons, *The FCC's Personal Attack and Political Editorial Rules Reconsidered*, 125 U.Pa.L.Rev. 990 (1977).

government regulation of speech and of the press,[14] because it furthers the paramount first amendment right of viewers and listeners to receive "suitable access to . . . ideas and experiences." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 389–90, 89 S.Ct. 1794, 1806-1807, 23 L.Ed.2d 371 (1969). The Court justified the fairness doctrine's imposition of limitations on broadcast content on the basis of the scarcity of broadcast frequencies. *Id.* at 390, 89 S.Ct. 1794. Because broadcast frequencies are scarce, not all those who wish to broadcast may do so. In essence, the fairness doctrine recognizes that broadcasters act as public trustees who manage a scarce national resource:[15]

> There is nothing in the First Amendment which prevents the Government from requiring a licensee to share his frequency with others and to conduct himself as a proxy or fiduciary with obligations to present those views and voices which are representative of his community and

which would otherwise, by necessity, be barred from the airwaves.

*Id.* at 389, 89 S.Ct. at 1806.

■ Although the Court in *Red Lion* legitimized the fairness doctrine, it recognized the argument that overly ambitious enforcement could lead broadcasters to reduce coverage of controversial public issues, or to cover those issues blandly, in an attempt to avoid fairness doctrine complaints.[16] *See id.* at 393, 89 S.Ct. 1794; *see generally Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256–57, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).[17] The Court believed this danger was speculative at that time. It warned, however, that the constitutional implications could be reconsidered if the fairness doctrine, in practice, reduced rather than enhanced the volume and quality of coverage of public issues. 395 U.S. at 393, 89 S.Ct. 1794.

In administering the fairness doctrine, the Commission wisely attempts to avoid unnecessary risk of "chilling" presentations of controversial issues.[18] The Commission

---

**14.** *See also Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 495–97, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed.2d 1260 (1948); *Columbia Broadcasting Sys. v. Democratic Nat'l Comm.*, 412 U.S. at 133, 93 S.Ct. 2080 (Stewart, J., concurring); *Community-Service Broadcasting v. FCC*, 192 U.S.App.D.C. 448, 456, 593 F.2d 1102, 1110 (1978) (en banc) (Wright, J.); *id.* at 489–90, 593 F.2d at 1143–44 (Leventhal, J., dissenting).

**15.** *See Office of Communication of United Church of Christ v. FCC*, 138 U.S.App.D.C. 112, 117, 425 F.2d 543, 548 (1969).

**16.** At some point, of course, a broadcaster who refrained from presenting coverage of controversial public issues would fail to fulfill its obligations under the first part of the fairness doctrine—that broadcasters must devote a reasonable amount of time to such issues. *See* text *supra* at 197 U.S.App.D.C. at ——, 607 F.2d at 443; Fairness Report, 48 F.C.C.2d at 9–10; *see also Red Lion Broadcasting Co. v. FCC*, 395 U.S. at 392–93, 89 S.Ct. 1794. This obligation, however, is not extensive and is met by presenting a minimum of controversial subject matter. *See* Simmons, *The Problem of "Issue" in the Administration of the Fairness Doctrine*, 65 Cal.L.Rev. 546, 578–86 (1977); Rosenfeld, *The Jurisprudence of Fairness: Free-*

*dom Through Regulation in the Marketplace of Ideas*, 44 Fordham L.Rev. 877, 912–13 (1976).

**17.** In *Miami Herald*, the Court held that a right-to-reply statute applicable to newspapers was unconstitutional. The Court recounted its

> sensitivity as to whether a restriction or requirement constituted the compulsion exerted by government on a newspaper to print that which it would not otherwise print. The clear implication has been that any such a compulsion to publish that which "'reason' tells them should *not* be published" is unconstitutional. A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues cannot be legislated.

418 U.S. at 256, 94 S.Ct. at 2839. The Court explained that, faced with such a statute, newspaper editors might well decide to avoid controversy in their publications, which would "'dampen[] the vigor and limit[] the variety of public debate.'" *Id.* at 257, 94 S.Ct. at 2839 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). *See also Cox Broadcasting Corp. v. Cohn*, 420 U.S. at 496, 95 S.Ct. 1029.

**18.** The Commission is expressly prohibited from censoring broadcast communications. *See* 47 U.S.C. § 326 (1976). In *FCC v. Pacifica Foundation*, 430 U.S. 726, 735, 98 S.Ct. 3026, 57

is concerned that unduly burdensome regulation will induce broadcasters to decrease vigorous and effective coverage of issues that are the subject of public debate.[19] This result would advance neither the broadcasters' nor the public's first amendment rights. *See Fairness Report,* 48 F.C.C. 2d at 6–9; *see also Memorandum Opinion and Order on Reconsideration of the Fairness Report,* 58 F.C.C.2d 691, 694 (1976); *id.* at 708 n.13 (Robinson, C., dissenting). The Commission thus exercises its duties under the fairness doctrine with restraint, balancing the various first amendment interests to determine "what best serves the public's right to be informed." *Columbia Broadcasting System v. Democratic National Committee,* 412 U.S. 94, 102, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).[20]

 At center stage of the Commission's regulatory scheme is its determination that broadcasters should have maximum editorial discretion in deciding how to fulfill fairness doctrine obligations. *See Fairness Report,* 48 F.C.C.2d at 8–9, 28–31. In the course of presenting its programming, the broadcaster decides what issue has been discussed, whether an issue is a controversial issue of public importance,

what views have been or should be presented on the issue,[21] what format or which spokesmen should be used, and how much time should be allotted to discussion of various views.[22] *See Applicability of Fairness Doctrine in Handling Controversial Issues of Public Importance (Fairness Primer),* 40 F.C.C. 598, 599 (1964); *see also Fairness Report,* 48 F.C.C.2d at 9.

 A viewer or listener who believes that a broadcaster is not meeting its fairness doctrine obligations must first complain to the broadcaster.[23] *See Broadcast Procedure Manual,* 49 F.C.C.2d 1, 5 (1974). If the broadcaster agrees to rectify the complaint or explains its position to the satisfaction of the complainant, Commission intervention is unnecessary. *See id.; Memorandum Opinion and Order on Reconsideration of the Fairness Report,* 58 F.C.C.2d at 696. A viewer or listener who remains dissatisfied may then file a complaint with the Commission.

 Such a complaint must present prima facie evidence of a fairness doctrine violation. Prima facie evidence consists of specific factual information which, in the absence of rebuttal, is sufficient to show that a fairness doctrine violation exists.[24]

---

L.Ed.2d 1073 (1978), the Court stated that the censorship prohibition denies the Commission power to edit broadcasts in advance and to excise material considered inappropriate for the airwaves. *See also id.* at 735 n.9, 98 S.Ct. 3026; *National Ass'n for Better Broadcasting v. FCC,* 192 U.S.App.D.C. 203, 209, 591 F.2d 812, 818 (1978); *see generally* Comment, *The Regulation of Competing First Amendment Rights: A New Fairness Doctrine Balance After CBS,* 122 U.Pa.L.Rev. 1283, 1288 & n.33 (1974).

19. *See* note 16 *supra.*

20. *See generally* Rosenfeld, *supra* note 16, at 885–87.

21. The fairness doctrine does not require a broadcaster to present the entire spectrum of views on an issue. The broadcaster must only make a good faith effort to identify and present the major views being debated in the community. *See* Fairness Report, 48 F.C.C.2d at 14–15; *see also* Horace P. Rowley, 39 F.C.C.2d 437, 441–42 (1973).

22. The fairness doctrine does not require a broadcaster to provide equal time for the vari-

ous opposing points of view. The Commission has "long felt that the basic goal of creating an informed citizenry would be frustrated if for every controversial item or presentation on a newscast or other broadcast the licensee had to offer equal time to the other side." Fairness Report, 48 F.C.C.2d at 16. There is no mathematical ratio to establish the appropriate time allocations; the licensee must exercise good faith and reasonableness in considering the particular facts and circumstances of each case. *Id.* at 17; *see Public Media Center v. FCC,* 190 U.S.App.D.C. 425, 432–35, 587 F.2d 1322, 1329–32 (1978).

23. ASCEF, before releasing the report of its study, advised CBS of its findings and requested a reasonable opportunity for the presentation of A viewpoints. After considerable correspondence, CBS informed ASCEF that, in its opinion, it had not violated the fairness doctrine. *See* J.A. at 3.

24. *See generally Columbus Broadcasting Coalition v. FCC,* 164 U.S.App.D.C. 213, 216–17, 219–20, 505 F.2d 320, 323–24, 326–30 (1974) (discussing prima facie case requirements for

Unless the complaint contains such evidence, the Commission will not demand a response to a complaint from a broadcaster.

The prima facie evidence requirement is "part of the delicate balance allocating burdens between licensees and complainants": the complainant must produce prima facie evidence of a violation before the broadcaster will be burdened with establishing compliance with the fairness doctrine. *Memorandum Opinion and Order on Reconsideration of the Fairness Report*, 58 F.C.C.2d at 696; *see* text *supra* at 197 U.S.App. D.C. at ————, 607 F.2d at 444–445. The Commission explained the reasons for the prima facie evidence requirement in *Allen C. Phelps*, 21 F.C.C.2d 12, 13 (1969):

> Absent detailed and specific evidence of failure to comply with the requirements of the fairness doctrine, it would be unreasonable to require licensees specifically to disprove allegations . . . . The Commission's policy of encouraging robust, wide-open debate on issues of public importance would in practice be defeated if, on the basis of vague and general charges of unfairness, we could impose upon licensees the burden of prov-

ing the contrary by producing recordings or transcripts of all news programs, editorials, commentaries, and discussion of public issues, many of which are treated over long periods of time.[25] *See Memorandum Opinion and Order on Reconsideration of the Fairness Report*, 58 F.C.C.2d at 696.

In its *Fairness Primer*, 40 F.C.C. at 600, the Commission set forth the information necessary to establish a prima facie case of a violation. The complainant should submit specific facts to show

> (1) the particular station involved; *(2) the particular issue of a controversial nature discussed over the air*; (3) the date and time when the program was carried; (4) the basis for the claim that the station has presented only one side of the question; and (5) whether the station had afforded, or has plans to afford, an opportunity for the presentation of contrasting viewpoints. (Emphasis added; footnote omitted.)

*See also Memorandum Opinion and Order on Reconsideration of the Fairness Report*, 58 F.C.C.2d at 696; *Fairness Report*, 48 F.C.C. at 19.[26] This court has upheld the

---

petition to deny a broadcast license under 47 U.S.C. § 309(d)); *Stone v. FCC*, 151 U.S.App. D.C. 145, 150–51, 157–59, 466 F.2d 316, 321–22, 328–30 (1972) (same); *WLVA, Inc. v. FCC*, 148 U.S.App.D.C. 262, 269–70, 273–74, 459 F.2d 1286, 1293–94, 1297–98 (1972) (same); *Folkways Broadcasting Co. v. FCC*, 126 U.S.App. D.C. 123, 127–29, 375 F.2d 299, 303–05 (1967) (same); *id.* at 132–34, 375 F.2d at 308–10 (Tamm, J., dissenting).

In general terms, prima facie evidence is evidence which is sufficient in law to sustain a finding in favor of a claim, but which may be contradicted. *See* Black's Law Dictionary 1353 (Rev. 4th ed. 1968).

**25.** In responding to a fairness doctrine complaint, "[f]ull opportunity is given to the licensee to set out all programs which he has presented, or plans to present, with respect to the issue in question during an appropriate time period." Fairness Primer, 40 F.C.C. at 600. More recently, the Commission stated that the broadcaster "is not required to research everything it has broadcast on the subject over a considerable period of time, unless it believes it is necessary to do so in order to establish its compliance with the fairness doctrine with respect to the issue involved." Fairness Report, 48 F.C.C.2d at 20; *see generally*

*Democratic Nat'l Comm. v. FCC*, 148 U.S.App. D.C. 383, 399–400, 460 F.2d 891, 907–08, *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972).

**26.** In its Broadcast Procedure Manual, 49 F.C. C.2d 1, 5 (1974), the Commission described the components of a prima facie case more specifically:

> The complaint should contain specific information concerning the following matters: (1) The name of the station or network involved; (2) the controversial issue of public importance on which a view was presented; (3) the date and time of its broadcast; (4) the basis for your claim that the issue is controversial and of public importance; (5) an accurate summary of the view [or] views broadcast; (6) the basis for your claim that the station or network has not broadcast contrasting views on the issue or issues in its overall programming; and (7) whether the station or network has afforded, or has expressed the intention to afford, a reasonable opportunity for the presentation of contrasting viewpoints on that issue.

In its Fairness Report, the Commission stated it will excuse the complainant from listing the

reasonableness of these requirements. *See Hale v. FCC*, 138 U.S.App.D.C. 125, 127–28, 425 F.2d 556, 558–59 (1970) (per curiam); *see also Democratic National Committee v. FCC*, 148 U.S.App.D.C. at 399–400, 460 F.2d at 907–08.[27]

■ If the Commission determines that there is prima facie evidence of a fairness doctrine violation, it will direct the broadcaster to respond to the complaint. *See Memorandum Opinion and Order on Reconsideration of the Fairness Doctrine*, 58 F.C. C.2d at 696. The Commission finds that prima facie evidence of a violation exists in relatively few cases. During fiscal year 1973, for example, the Commission received approximately 2,400 complaints and determined that only ninety-four, or four per cent, required the filing of a response. *See Fairness Report*, 48 F.C.C.2d at 8. When the Commission does require a broadcaster to respond to a fairness doctrine complaint, it reviews the response to determine whether the broadcaster's decisions with respect to the issues raised,[28] the views presented,

the format and spokesmen used, and the time allotted were made reasonably and in good faith. *See Fairness Primer*, 40 F.C.C. 2d at 599; *see also Straus Communications, Inc. v. FCC*, 174 U.S.App.D.C. 149, 156–57, 530 F.2d 1001, 1008–09 (1976); *Brandywine-Main Line Radio, Inc. v. FCC*, 153 U.S.App.D.C. 305, 333, 473 F.2d 16, 44 (1972), *cert. denied*, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973). If the Commission determines that the broadcaster acted unreasonably or in bad faith,[29] it will advise the broadcaster to meet its fairness obligations through additional programming. *See Fairness Report*, 48 F.C.C.2d at 17.

■ Our function in reviewing a decision made by the Commission at any step of the fairness doctrine complaint procedure is to determine " 'whether the Commission's order is unreasonable or in contravention of statutory purpose.' " *Democratic National Committee v. FCC*, 148 U.S.App.D.C. at 394, 460 F.2d at 912 (quoting *Neckritz v. FCC*, 446 F.2d 501, 502–03 (9th Cir. 1971) (per curiam)). We are mindful that the Com-

date and time of each particular program addressing the issue if a message on one side of the issue obviously has been repeated many times, as in an editorial advertising campaign. 48 F.C.C.2d at 20 n.19. The Commission has reiterated in a number of its cases the requirement that a complaint contain an *accurate* summary of the views presented. *See, e. g.*, James L. Waller, 57 F.C.C.2d 1281, 1282 (1976); Thomas E. Mitchell, 54 F.C.C.2d 593, 595 (1975); Robert O. Galligan, 48 F.C.C.2d 343, 344 (1974).

27. The most frequent subjects of dispute arising under the prima facie evidence requirement concern whether the complainant presented sufficient information to show (1) that a particular issue was discussed in the challenged programming, *see, e. g.*, Thomas E. Mitchell, 54 F.C.C.2d at 595; Roger Pilon, 53 F.C.C.2d 615, 616 (1975); Citizens for Decency, 50 F.C.C.2d 328, 329 (1974); Robert O. Galligan, 48 F.C.C. 2d at 344–45; Horace P. Rowley, 44 F.C.C.2d 770, 770–71 (1974); John F. Jackson, 44 F.C.C. 2d 752, 754 (1974); Accuracy in Media, 42 F.C.C.2d 426, 428–29 (1973); (2) that an issue is a controversial issue of public importance, *see, e. g.*, Hon. Baldy Hansen, 47 F.C.C.2d 34, 35 (1974); Horace P. Rowley, 46 F.C.C.2d 748, 749–50 (1974); John Birch Society, 11 F.C.C.2d 790, 791 (1968); and (3) that a broadcaster has presented only one side of the issue in its overall programming, *see, e. g.*, Jos. A. O'Connor, 59 F.C.C.2d 605, 606 (1976); Dale Pontius, 46

F.C.C.2d 1118, 1120 (1974); Horace P. Rowley, 39 F.C.C.2d at 443.

28. A broadcaster may not agree with the complainant about what issue was raised in a broadcast. In this connection, the Commission has stated:

Where a licensee poses an alternative issue to that specified in the complaint, such alternative will be considered an implicit denial that the basic thrust of the program addressed the issue specified by the complaint. In such a case the Commission will continue to review the reasonableness of the licensee's denial, considering the alternative issue as evidence concerning the licensee's good faith and reasonableness. Any departure from this policy would render useless the requirement for specificity by the complainant and permit licensees to avoid presenting opposing viewpoints by sophistic distinctions entirely lost on the average viewer.

Memorandum Opinion and Order on Reconsideration of the Fairness Report, 58 F.C.C.2d 691, 697 n.8 (1976).

29. It is the Commission's practice to deal with fairness doctrine complaints by written submissions rather than by evidentiary hearings. *See Democratic Nat'l Comm. v. FCC*, 148 U.S.App. D.C. at 394, 460 F.2d at 912.

mission's task in administering the fairness doctrine is one of great delicacy and difficulty, and that the Commission's experience in this matter accordingly is entitled to "great weight." *Columbia Broadcasting System v. Democratic National Committee,* 412 U.S. at 102, 93 S.Ct. 2080.

### III

The Commission ruled that ASCEF failed to meet the prima facie evidence requirement because, *inter alia,* it did not base its complaint on a particular, well-defined issue. *American Security Council Education Foundation,* 63 F.C.C.2d 366, 368 (1977). In dismissing the complaint, the Commission stated:

> Although the "national security issue" is defined by the complainant as involving "the basic conflict relationship and the relative military balance between the U.S. and the U.S.S.R." in other parts of the complaint ASCEF refers to the subject of the study as "national defense and foreign policy issues," "Soviet and Chinese political and military objectives," and "domestic foreign policy." Moreover, the data collected in the accompanying study indicates that the complainant's perceived scope of the issue is much broader, encompassing subjects such as Chinese military and non-military policies, Southeast Asia and foreign relations generally.

*Id.* at 368 (footnote omitted).[30] We affirm the Commission's decision that ASCEF

failed to base its complaint on a particular, well-defined issue because (1) the indirect relationships among the issues aggregated by ASCEF under the umbrella of "national security" do not provide a basis for determining whether the public received a reasonable balance of conflicting views, and (2) a contrary result would unduly burden broadcasters without a countervailing benefit to the public's right to be informed.

 The fairness doctrine, by definition, is issue-oriented. It calls upon broadcasters to provide fair coverage on each controversial public issue discussed in their programs. *See* text *supra* at 197 U.S.App.D.C. at ——, 607 F.2d at 443; *National Citizens Committee for Broadcasting v. FCC,* 186 U.S. App.D.C. 102, 118, 567 F.2d 1095, 1111 (1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978); *Green v. FCC,* 144 U.S.App.D.C. 353, 355, 447 F.2d 323, 328 (1971). A fairness doctrine complaint, therefore, must focus the Commission's attention on a particular, well-defined issue on which coverage was allegedly imbalanced.[31] Presentation of such an issue is a prerequisite to a determination whether a broadcaster presented a reasonable balance of conflicting views.[32]

ASCEF contends in this court that "national security" is a particular, well-defined issue. Brief for Petitioner at 7 & n.8, 56–57. ASCEF defines the issue, however, by aggregating under a broad umbrella concept individual issues that it determined

**30.** The Commission explained the reason for requiring the complainant to specify the particular issue on which its complaint is based:

> This requirement is needed so that complainants, licensees and the Commission will have a clearer understanding of the positions of the parties. This is particularly true because once the burden of specificity has been placed upon the complainant, our attention and that of the licensee is then directed to the issue as framed by the complainant. We do not intend to be placed in the position of specifying the alleged controversial issue of public importance in a complaint. It is not the proper function of the administering agency to frame the complaints coming before it and it is incumbent upon the complaining party to bring before us a *prima facie* complaint.

American Sec. Educ. Foundation, 63 F.C.C.2d 366, 368 (1977) (quoting Memorandum Opinion and Order on Reconsideration of the Fairness Report, 588 F.C.C.2d at 696).

**31.** The Commission has said that "imbalance might be a reflection of the total *amount* of time afforded to each side, of the *frequency* with which each side is presented, of the size of the *audience* during the various broadcasts, or a combination of factors." Fairness Report, 48 F.C.C.2d at 17 (emphasis in original).

**32.** *See generally* Roger Pilon, 53 F.C.C.2d at 616; Hakki S. Tamimie, 42 F.C.C.2d 876, 877 (1973); Robert L. Sassone, 37 F.C.C.2d 1017, 1017–18 (1972).

were relevant to national security. As ASCEF stated in the material it submitted to the Commission, the study which formed the basis of its allegation of imbalance "deal[t] with many U.S. foreign and defense policies" and various "national security issues facing the United States." TV and National Defense at vi, 3. The broadcasts ASCEF studied involved issues as distinct as America's commitment to the North Atlantic Treaty Organization (NATO), detente with China, SALT, amnesty, the Vietnam war, and America's response to the Soviet Union's role in the Middle East.[33]

The issues that ASCEF joined together may have relevance, in varying degrees, to the umbrella concept of "national security." However, their relationships to one another are tangential. The issues analyzed by ASCEF arose independently in time and were largely discussed and acted upon on an independent basis. Consideration of the issues together, rather than individually, would not provide a basis for determining whether the broadcaster presented a reasonable balance of conflicting views because views on any one issue do not support or contradict views on the others.

Under ASCEF's approach, a broadcast containing a view on SALT, for example, is expected either to conflict with or support a broadcast containing a view on amnesty for draft evaders, detente with China, or the Vietnam war. According to ASCEF, a news report quoting Defense Secretary Laird's statement that he "could not support the [SALT] agreements if the Congress fails to . . . [move] forward on the Trident System, [and] on the B–1 bomber"[34] conflicts with a news report stating that "[f]or those who have evaded service [the Democratic platform called for] 'amnesty on an appropriate basis' after the war when the prisoners are returned."[35] ASCEF contends that each of these broadcasts also conflicts with a news report concerning the President's trip to China, in which Walter Cronkite stated that the "gracious hospitality of our hosts here cannot disguise the fact [that] the weapons they are so proudly displaying . . . have taken uncounted numbers of American lives in Korea and Southeast Asia."[36] A view in any of these broadcasts, however, contributes little, if anything, toward informed evaluation of a view in any other. An average viewer realistically could not be expected to perceive such a nexus among them.

 We do not hold that a fairness doctrine complaint may never be based upon an issue that consists of separately identifiable sub-issues.[37] Whether the fairness doctrine should be applied to a general "umbrella" issue or to the separate issues comprising it depends on what should be done to insure that the public is adequately

---

33. As pointed out previously, ASCEF did not include a comprehensive list of the broadcasts it determined were relevant to national security; it only gave the Commission a relatively small number of examples. *See* note 5 *supra.* The issues that we identify are derived from the broadcasts given as examples and from charts used by ASCEF to explain its coding technique. It is unclear how many other issues were studied or what those issues were. It does appear that ASCEF decided that issues involving the draft, racial riots, drug use in the armed services, and military surveillance of civilians were relevant to national security. *See* TV and National Defense at 32.

34. *Id.* at 83. ASCEF categorized this news report as viewpoint B.

35. *Id.* at 84. ASCEF categorized this news report as viewpoint C.

36. *Id.* at 92. ASCEF categorized this news report as viewpoint A.

37. In Horace P. Rowley, 39 F.C.C.2d at 442, the Commission noted that "it is sometimes difficult to determine whether only one general issue exists or whether another distinct but related issue arising out of the general issue should be treated separately." The Commission stated "we can assume that the controversy over the bombing and mining [of North Vietnam] is sufficiently separable from the general controversy over the Vietnam war to be treated as a distinct issue under the Fairness Doctrine." *Id.; see* Hakki S. Tamimie, 42 F.C. C.2d at 877 (complainant stated issue was "Middle East"; Commission ruled complainant "failed to specify the particular aspect of the general topic which was discussed.")

informed.[38] *See Democratic National Committee v. FCC,* 148 U.S.App.D.C. at 402, 460 F.2d at 910; *Green v. FCC,* 447 F.2d at 329, 333. An issue is not a "particular, well-defined" issue for fairness doctrine purposes if the separate issues comprising it are so indirectly related that a view on one does not, in a way that would be apparent to an average viewer or listener, support or contradict a view on any other. When an "umbrella" issue is that ill-defined, there is no reasonable basis for determining whether the public is receiving balanced conflicting views. On the other hand, if in the Commission's expert judgment, an issue contains two or more component issues so obviously related that average viewers or listeners can be expected to believe that expression of a view on one supports or refutes a view on another, the "umbrella" issue can serve as the basis of a fairness doctrine complaint. In this connection, we emphasize that it is, after all, the rights of viewers and listeners that are paramount, not the rights of broadcasters or expert complainants. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. at 390, 89 S.Ct. 1794.

■ If ASCEF had focused on individual issues, it could have identified the actual views expressed [39] instead of superimposing artificial A, B and C viewpoints on the broadcasts studied. The Commission then could have determined which, if any, issues had been the subject of imbalanced coverage, and could have ordered a meaningful remedy in the form of additional coverage if necessary. If a broadcaster fulfills fairness obligations on the various issues relating to national security, the fairness doctrine's goal of promoting informed public opinion will be served.

■ Acceptance of ASCEF's contention that "national security" is a particular, well-defined issue would not only render impossible a determination of reasonable

**38.** A relevant consideration in some cases may be whether the component issues are controversial issues of public importance. If they are not, no obligation to provide contrasting views will arise. In this case there is no doubt that most of the issues aggregated by ASCEF under the umbrella of "national security" are controversial issues of public importance.

**39.** In this connection, we note that a complainant must also show that the defined issue was meaningfully discussed in the broadcasts in question. Advocacy of a position on an issue need not be explicit to constitute meaningful discussion, but the statements made must be "so substantially and obviously related to the . . . issue as to amount to advocacy of a position" thereon. Fairness Report, 48 F.C.C.2d at 12. It is doubtful that ASCEF could have shown that positions on its "national security issue" were "meaningfully discussed" throughout the challenged broadcasts. *See* Thomas E. Mitchell, 54 F.C.C.2d at 595 (complaint dismissed for failure to show police and detective dramas meaningfully discussed issue of handgun control); Robert O. Galligan, 48 F.C.C.2d at 344–45 (complaint dismissed for failure to show station editorial encouraging visit to department of state university meaningfully discussed issue of alleged department scandal); Horace P. Rowley, 44 F.C.C.2d at 771 (complaint dismissed for failure to show broadcast of union members' views on job opportunities and union services meaningfully discussed issues of union pensions or union power); John F. Jackson, 44 F.C.C.2d at 754 (complaint dismissed for failure to show broadcast of inter-

view with Vietnam war veteran who received less-than-honorable discharge meaningfully discussed issues of draft and combat assignment of servicemen to Vietnam); *see also National Citizens Comm. for Broadcasting v. FCC,* 186 U.S.App.D.C. 102, 115–17, 567 F.2d 1095, 1108–10 (1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978); *National Organization for Women v. FCC,* 181 U.S.App. D.C. 65, 75–8, 555 F.2d 1002, 1012–15 (1977).

The Commission apparently was referring to the "meaningful discussion" requirement when it stated:

The procedure by which the opinions expressed on these issues are cataloged under the three viewpoint codes is unclear. Although ASCEF contends that it has "avoided the pitfalls of subjectivity" in this matter, there appears to be no explanation for the resulting categorization other than the use of subjective judgment on the part of the researchers. For instance, we do not perceive how views expressed on the non-military affairs of the Chinese government can be classified under headings dealing with the "threat to U.S. security" without the subjective conclusion being reached that an opinion on one issue necessarily implies an opinion on the other. *The Commission can look only to what specific issues have been presented,* not to the ideology which those who express those opinions might possess.

American Sec. Council Educ. Foundation, 63 F.C.C.2d at 369 (emphasis added).

balance *vel non,* but also would place a substantial burden on the broadcaster. A broadcaster must have a clear understanding of the issue forming the basis of a complaint in order to assess its compliance with the fairness doctrine. Unless a broadcaster can recognize the issue "with precision and accuracy," *American Security Council Education Foundation,* 63 F.C.C.2d at 368, proof of compliance with the fairness doctrine would require the production of "recordings or transcripts of all news programs, editorials, commentaries, and discussion of public issues, many of which are treated over long periods of time." *Allen C. Phelps,* 21 F.C.C.2d at 13; *see* note 25 *supra.* The Commission has wisely determined that imposition of such onerous burdens on broadcasters would, in practice, defeat the policy of "encouraging robust, wide-open debate." 21 F.C.C.2d at 13; *see* text *supra* at 197 U.S.App.D.C. at —— ——, 607 F.2d at 444–445.

The burdens that would have been associated with response to the complaint in this case are particularly apparent. CBS could have had to review all of its news programming relevant to national security over at least a year's time. It then would have had to determine whether the relevant news broadcasts, taken as a whole, were reasonably balanced. It would have been virtually impossible to know which broadcasts should be included as relevant to national security,[40] or how views discussed on the myriad issues involved in the broadcasts should be tallied to measure "balance" under the fairness doctrine.

Adoption of ASCEF's notion of the particular issue requirement would create a precedent that might well have a serious effect on daily news programming, by inducing broadcasters to forego programming on controversial issues or by disrupting the normal exercise of journalistic judgment in such programming that is aired. The broadcasting of daily news demands the exercise of enormous editorial skill. The news editor must select from the vast array of the day's fast-moving events those which, in the limited amount of broadcast time available, should be presented to the public. In attempting to comply with the fairness doctrine as interpreted by ASCEF, an editor's news judgment[41] would be severely altered. An editor preparing an evening newscast would be required to decide whether any of the day's newsworthy events is tied, even tangentially, to events covered in the past, and whether a report on today's lead story, in some remote way, balances yesterday's, last week's or last year's. Because this requirement would not promote the public interest, the limitations on the exercise of news judgment would be unjustified.[42]

### IV

■■■ ASCEF's blunderbuss approach to the fairness doctrine would contribute little,

40. For example, does a broadcast concerning the role of women in the armed services sufficiently relate to national security to be included in the analysis? *See* Gilder, *The Case Against Women in Combat,* N.Y. Times Mag., Jan. 28, 1979, at 29, Col. 1. ASCEF apparently believes that it does. *See* TV and National Defense at 32. Is a broadcast concerning the strength of the American dollar sufficiently related to national security to be included? *See* Evans & Novak, *The 'Downward Course' of American Power,* the Washington Post, Mar. 12, 1979, at A19, Col. 1. The same question can be asked of many different issues, including, for example, the state of energy supplies.

41. In affirming a Commission refusal to order an evidentiary hearing in a license renewal proceeding on the basis of a claim of "discrimina-

tory weighting of news items," this court recently stated:

> Generally the licensee's news judgment will not be questioned unless there is extrinsic evidence of deliberate distortion or news staging, *CBS Program, "Hunger in America."* [20 F.C.C.2d 143, 150–51 (1969)], or unless the licensee consistently fails to report news events of public importance that could not in good faith be ignored, *Radio Station WSNT, Inc.,* [27 F.C.C.2d 993, 995 (1971)].

*National Organization for Women v. FCC,* 181 U.S.App.D.C. at 73, 555 F.2d at 1010. ASCEF does not allege that CBS deliberately distorted the news. *See* Brief for Petitioner at 57 n.30.

42. *See generally Columbia Broadcasting Sys. v. Democratic Nat'l Comm.,* 412 U.S. at 110, 93 S.Ct. 2080.

if anything, toward achievement of the fairness doctrine's goal while posing all the dangers associated with government administration of fairness obligations. The prima facie case requirements are designed to weed out those complaints that would burden broadcasters without sufficient likelihood that a countervailing benefit will be gained. We uphold the Commission's determination that ASCEF failed to present prima facie evidence of a fairness doctrine violation.[43] The Commission's decision that no action was warranted on the complaint is therefore

*Affirmed.*

J. SKELLY WRIGHT, Chief Judge, concurring:

This court today affirms a decision of the Federal Communications Commission (FCC) that dismissed a fairness doctrine complaint filed against CBS, Inc. and its owned and operated stations.[1] The complaint, petitioner here, is the American Security Council Education Foundation (ASCEF), "a non-profit educational institution whose purpose is to improve public understanding of facts and issues relating to the national security of this country."[2] The gravamen of ASCEF's charge against CBS is that broadcasts of the CBS Evening News during 1972 possessed a decidedly "dovish"[3] slant on matters pertaining to "national security."[4] To remedy this perceived shortcoming, ASCEF asked the FCC to require CBS to afford a reasonable opportunity for the presentation of contrasting views on national security.[5]

The FCC, in dismissing the complaint, decided *inter alia* that ASCEF had failed to make out a *prima facie* case under the fairness doctrine[6] because "national security" was not defined with sufficient precision in the complaint to allow for a reasonable response from CBS.[7] A divided panel of this court disagreed and ordered that the FCC demand from CBS a response to the

---

**43.** Because of our disposition of this case, we have no need to consider other possible bases for the Commission's dismissal of the complaint.

**1.** *In re American Security Education Foundation,* 63 FCC2d 366 (1977). The FCC's decision was reversed and remanded by a panel of this court, *American Security Council Education Foundation v. FCC,* D.C.Cir. No. 77–1443 (Sept. 13, 1978), but that judgment was later vacated.

**2.** Petitioner's brief at 1.

**3.** This word appears throughout petitioner's brief. *See, e. g.,* petitioner's brief at 2.

**4.** For a discussion of the amorphousness of "national security," and its consequent inadequacy in the fairness doctrine context, *see* text at notes 26–38 *infra.*

The fairness complaint was based on a study of the 1972 CBS Evening News that was published as E. Lefever, TV and National Defense (1974). The study is analyzed in text at notes 39–47 *infra.*

**5.** Petitioner's Prayer for Relief before the FCC contained, *inter alia,* the following requests:

D. Upon a finding that CBS–TV News has violated the Fairness Doctrine, to require that CBS–TV News:

1) begin providing reasonable opportunities for responsible persons to express the following contrasting views:

a. The Soviet Union still has the objective of eventual world domination.

b. The Soviet Union is militarily superior to the United States.

c. The United States should be militarily superior to the Soviet Union.

d. The United States should have the objective of winning the conflict between the two systems.

and 2) provide compensatory opportunities for the expression of the above views to help balance the years of non-coverage of such views.

Joint Appendix (JA) 21.

**6.** The FCC also decided that the ASCEF study that underlay the complaint was inadequate because it did not examine the overall programming of the network, but rather focused exclusively on the CBS Evening News. *In re American Security Council Education Foundation, supra* note 1, 63 FCC2d at 369. I find this argument of the FCC unpersuasive because of the central and dominating role that the Evening News plays in the network's coverage of public events.

**7.** *Id.* at 367–369.

complaint.[8] Because, in my view, the panel was inattentive to the First Amendment values at stake in this case,[9] incorrect in its determination that national security is a sufficiently precise issue to make out a *prima facie* case,[10] and indifferent to the shortcomings of the ASCEF study that underlay the complaint,[11] I concur in this court's *en banc* decision to affirm the FCC. I write specially, not to detract from Judge Tamm's opinion, but to lend emphasis to certain of his arguments.

## I. THE FIRST AMENDMENT BACKDROP

Under the fairness doctrine,[12] a broadcaster is required to present coverage of issues of public importance and, on those issues of public importance that are controversial, to see to it that the coverage fairly reflects differing viewpoints.[13] When the FCC receives a complaint alleging that a broadcaster has ignored its obligations under the fairness doctrine, the Commission must first decide whether the charge is sufficient to require a response from the broadcaster.[14]

In making this determination, the FCC must exercise its discretion with great care and with due regard for First Amendment interests.[15] If the Commission were to serve merely as a conduit for all charges made against broadcasters under the fairness doctrine, an unfortunate and unacceptable burden would be placed on communications.[16] Broadcasters, aware that the slightest perceived transgression of the doctrine might trigger a demand for a resource-consuming response on their part, would be loath to run the risk.[17] Timidity might well supplant curiosity as the operative journalistic ethic in radio and television coverage of public events.

To preclude the possibility of such a chilling effect, and the consequent undermining of the First Amendment interest in the public's "suitable access to social, political, esthetic, moral, and other ideas and experiences"[18] provided by broadcasters, the FCC has constructed a formidable procedural barrier, but one that is not insurmountable to complainants with legitimate fairness doctrine claims.[19] The barrier is the traditional and time-tested device of the *prima facie* case,[20] one element of which is the identification of an issue of sufficient specificity to allow for a direct and efficient response from the broadcaster. The re-

8. *American Security Council Education Foundation v. FCC, supra* note 1.

9. *See* text at notes 12–26 *infra*.

10. *See* text at notes 26–38 *infra*.

11. *See* text at notes 39–47 *infra*.

12. The roots of the fairness doctrine are sunk deep, and there is no need here to engage in the routine excavation that would once again establish their depth. *See, e. g., Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Report on Editorializing by Broadcast Licensees*, 13 FCC 1246 (1949).

13. *See, e. g., Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee*, 412 U.S. 94, 111, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *Red Lion Broadcasting Co. v. FCC, supra* note 12, 395 U.S. at 377, 89 S.Ct 1794; *Public Media Center v. FCC*, 190 U.S.App.D.C. 425, 431, 587 F.2d 1322, 1328 (1978).

14. *See Reconsideration of the Fairness Report*, 58 FCC2d 691, 694–696 (1976).

15. *See, e. g., Banzhaf v. FCC*, 132 U.S.App.D.C. 14, 27, 405 F.2d 1082, 1095 (1968), *cert. denied*, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

16. *See, e. g., Reconsideration of the Fairness Report, supra* note 14, 58 FCC2d at 696.

17. *See Brandywine-Main Line Radio, Inc. v. FCC*, 153 U.S.App.D.C. 305, 333, 473 F.2d 16, 44 (1972) ("It was never intended by either Congress, or the Commission, that the [fairness] doctrine work toward suppression of the discussion of controversial issues.").

18. *Red Lion Broadcasting Co. v. FCC, supra* note 12, 395 U.S. at 390, 89 S.Ct. 1794, 1807.

19. *See, e. g., Energy Action Committee, Inc.*, 64 FCC2d 787 (1977).

20. *See Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance*, 29 Fed.Reg. 10416, 10418, 40 FCC 598, 604 (1964); *Reconsideration of the Fairness Report, supra* note 14, 58 FCC2d at 694–696.

quirement that complainants make out a *prima facie* case before the FCC will demand that the broadcaster respond is a sign of humility; it represents a conscious shrinking back, as it were, by a government agency whose regulatory domain overlaps that of the First Amendment.[21]

Petitioner, however, portrays the requirement of the *prima facie* case in a different light. Rather than a safety screen around protected speech constructed by a responsible governmental organ, imposition of the requirement in this case is labeled "administrative fiat."[22] Because petitioner conceives of its study of the CBS Evening News as "the most thorough scientific analysis of a network news operation ever undertaken by anyone at anytime since the advent of television,"[23] it apparently cannot fathom how its complaint could fail to meet the FCC's procedural test. ASCEF's logic is simple: because its study was good, the procedural test that it flunked must be bad. The argument is not original; it has been employed throughout the ages by students claiming adequate preparation who have nonetheless failed an examination.

I am not oblivious, nor is this court, to the pathos surrounding petitioner's observation that the substantial time and resources devoted to the study have gone largely for naught.[24] Indeed, as I shall argue below,[25] there is a place under the fairness doctrine for the type of extensive study petitioner attempted to undertake here. Yet just as academic excellence cannot be compromised by the plaintive cries of errant students, speech cannot be regulated in accordance with the demands of a well-meaning foundation that has expended substantial resources on a study that, whatever its merits otherwise, was ill-conceived in terms of the requirements of the fairness doctrine.[26]

## II. NATIONAL SECURITY AS AN ISSUE

ASCEF's study that formed the basis of its fairness complaint found that the CBS Evening News did not adequately portray differing viewpoints on national security during 1972. The FCC, in dismissing the complaint, largely relied on the lack of specificity in the notion "national security." The amorphousness of national security, argued the FCC, defies any attempt to cast the notion with sufficient specificity to make out a *prima facie* case under the fairness doctrine. Further, to require CBS to respond to such an ill-defined charge would, as shown above, threaten to chill future communications.

It is difficult to dispute the FCC's conclusion, although my dissenting colleagues manage to do so. That "national security" means different things to different people is incontestable and, in this fairness doctrine context, fatal to petitioner's complaint. To some, national security means devoting the bulk of our national resources to creating the ideal society—one, that is, whose economic dynamism and social amenities are attractive to citizens of foreign powers and thus likely to channel the currents of world ideology in our direction. To others, this is nonsense: national security translates literally into military superiority. Still others take a more discriminating view and seek to arrive at a secure compromise

---

21. This requirement has been judicially endorsed. *See, e. g., Hale v. FCC,* 138 U.S.App. D.C. 125, 128, 425 F.2d 556, 559 (1970).

22. Petitioner's brief at 16.

23. *Id.* at 5–6.

24. One might surmise that the time and resources were not *entirely* for naught, as ASCEF did gain a certain notoriety in consequence of the study.

25. *See* text at notes 39–47 *infra.*

26. There was no element of surprise in this case, in the sense that due diligence on the part of the ASCEF personnel who designed the study and framed the fairness complaint would have revealed the existence of and reasoning behind the specificity requirement. *See, e. g., Green v. FCC,* 144 U.S.App.D.C. 353, 359, 447 F.2d 323, 329 (1971); *Fairness Report,* 48 FCC2d 1, 21 (1974). Although the ASCEF study that underlay the fairness complaint dealt with the 1972 news coverage, it was conducted in late 1973 and 1974 and was based on an examination of transcripts of the 1972 CBS Evening News.

between domestic improvements and military might.[27] And within each of these conceptions of national security there is a sufficient number of allocational configurations to correspond to the multiplicity of individual visions of a "secure" nation.[28]

Thus the possibilities surrounding national security are endless. The term is not susceptible to the gross reductionism of a "viewpoint analysis," such as that employed by petitioner,[29] that is cast in the finite mold of more, less, or the same.[30] If petitioner's world is populated by "hawks," "sparrows," and "doves,"[31] the real world, as I understand it, is an aviary of inexhaustible variety.

One need not rely exclusively on ordinary usage to underscore the indeterminacy of national security. A cursory glance at petitioner's papers before this court also illustrates the point. ASCEF's complaint before the FCC, for instance, described national security variously in terms of "the basic conflict relationship and the relative military balance between the U.S. and the U.S.S.R.";[32] "Soviet and Chinese political and military objectives";[33] and "domestic foreign policy."[34] Its brief on appeal, moreover, refers in places not to the national security issue but to "national security *issues.*"[35] Whether or not this apparently conscious wavering is acceptable to the large number of academicians who commented favorably on the ASCEF study and whose names surfaced conspicuously in petitioner's argument is irrelevant.[36] Of rele-

27. The point of view of President Carter, as evidenced in his latest State of the Union Message, is an example:

We are building that new foundation [for a stable world community] from a position of national strength * * *. America's military power is a major force for security and stability in the world. * * * I urge you to support the strong Defense budget I have proposed.

*But national security in our age requires more than military might.* In less than a lifetime, world population has doubled; colonial empires have disappeared; and a hundred new nations have been born. Mass communications, literacy, and migration to the world's cities have all awakened new yearnings for economic justice and human rights among people everywhere.

In such a world, the choice is not which superpower will dominate the world. None can and none will. The choice instead is between a world of anarchy and destruction, or a world of cooperation and peace.

*In such a world, we seek not to stifle inevitable change, but to influence its course in helpful and constructive ways that enhance our values, our national interests, and the cause of peace.*

Quoted in *The Washington Post,* January 24, 1979, at 6, col. 3 (emphasis added).

28. That is to say, even if one grants that national security has a single dimension—for example, military strength—one is still confronted with tough allocational questions. A news report that reveals the waste and inefficiency associated with the development of a particular weapon system might well, in the eyes of petitioner, rank as "dovish." Yet another inference that might properly be drawn from such a report is that the resources devoted to development of that system could be more efficiently employed if allocated to development of another.

This example is not fanciful. A report on opposition to the B–1 bomber was classified as "dovish" even though that opposition might well have been premised on the perceived ineffectiveness of that particular weapon system as opposed to others. *See* E. Lefever, *supra* note 4, at 90–91.

29. ASCEF's study is described in some detail in text at notes 39–47 *infra.*

30. The viewpoints employed in ASCEF's study that correspond to "more," "less," or "the same" amount of national security are described, in ASCEF's own words, in text at note 39, *infra.* Judge Wilkey's dissent makes the same mistake. Dissent at —— U.S.App.D.C. at ——, 607 F.2d at 467 (*"whether this nation should do more, less, or the same about perceived threats to its national security"*) (emphasis in original).

31. The avian metaphor is petitioner's. *See, e. g.,* petitioner's brief at 2, 11, 27, 44.

32. JA 19.

33. JA 10.

34. JA 18.

35. Petitioner's brief at 31 (emphasis added); *id.* at 33 ("national security subjects").

36. In fairness to ASCEF's study, it apparently was well received by many observers, none of whom, it must be added, had the responsibility of dovetailing the study with the fairness doctrine and the First Amendment. Some of the

vance is the undeniable truth that such sloppiness is not to be countenanced in the First Amendment context, a context that requires even state legislatures and the Congress of the United States to act with specificity and to avoid vague or overbroad incursions that could possibly chill speech.[37]

I should hasten to point out that the insufficient specificity of national security is not only a patent defect, as ordinary usage and petitioner's usage in this case attest, but a latent one as well, in the sense that national security *by its very nature* simply cannot be reduced to a definable core. National security is not, to be sure, a mere shibboleth. Nor is it a trite codeword. Codewords *ex hypothesi* have a single meaning to those with access to the code. Rather, national security defies precise definition because it is preambulary in nature.[38] And like all preambulary language, it is aspirational; different people rely on it and use it in different ways. Preambulary terms defy reductionist attempts at specificity because each such term represents a cluster of ideas, not all of which are in harmony and some of which may well be in rank discord. However commendable preambulary vagueness is in its proper context, to attack protected speech with such vagueness is as unthinkable as attempting to enforce a preamble as positive law.

## III. THE ASCEF STUDY

The ASCEF study that underlay the fairness complaint itself merits comment. We have already seen that the notion around which the study was constructed—national security—is too indeterminate to support a *prima facie* case under the fairness doctrine. In addition, there are methodological deficiencies that render the present study useless for purposes of a fairness doctrine complaint.

The study of the CBS Evening News during 1972 aimed to achieve objectivity by imposing an analytical trichotomy on the content of the news broadcast. The trichotomy was constituted of three "viewpoints." In the words of the study,

> *Viewpoint A* holds that the threat to U.S. security is more serious than perceived by the government or that the United States ought to *increase* its national security efforts; *Viewpoint B* holds that present government threat perception is essentially correct or U.S. military and foreign policy efforts are adequate, and *Viewpoint C* holds that the threat to U.S. security is less serious than perceived by the government or that U.S. national security efforts should be *decreased.*
> \* \* \* [39]

The central finding of the study was that Viewpoint A was significantly underrepresented in the CBS Evening News, and Viewpoint C overrepresented.[40]

---

critical acclaim is contained as "blurbs" on the back of the red, white, and blue cover in which the study is bound. I note, however, that three of the five favorable blurbs were provided by individuals who played a role in the study's development. *See* E. Lefever, *supra* note 4, at ix, x.

37. *See Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); Note, *The First Amendment Overbreadth Doctrine,* 83 Harv.L.Rev. 844 (1970); Note, *The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U.Pa.L.Rev. 67 (1960).

38. Consider the following:
WE THE PEOPLE of the United States, in Order to form *a more perfect Union*, establish *Justice*, insure *domestic Tranquility*, pro-

vide for the *common defence*, promote the *general Welfare*, and secure the *Blessings of Liberty* to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

One could no more define with specificity "national security" than one could define "a more perfect Union," "Justice," "domestic Tranquility," "the common defence," "the general Welfare," "the Blessings of Liberty," or, for that matter, "the pursuit of Happiness."

39. E. Lefever, *supra* note 4, at 78 (emphasis in original).

40. Of the 1,396 news items subjected to ASCEF's viewpoint analysis, 1,122 were found to contain no expressions of "A," "B," or "C" viewpoints. Of the remaining 274 news items, 3.54% were categorized as Viewpoint A, 34.63% as Viewpoint B, and 61.83% as Viewpoint C.

The inherent flaw in this breakdown of viewpoints is readily apparent, and has been examined by the majority opinion. In a two-party system such as ours, it is absurd to cast the position of the sitting government as a "norm" from which departures presumably ought to occur in equal numbers to the left and right.

Consider the chronological context of the present study. In 1972 President Nixon was opposed in his bid for reelection by a man, Senator McGovern, of largely opposite views on major issues.[41] It can be assumed that CBS devoted much of its news coverage to the election. If the network gave equal coverage to both camps, it would likely have meant that Viewpoint B and Viewpoint C would have been equally represented, and Viewpoint A largely unrepresented—precisely the "biased" result detected by the ASCEF study. Yet CBS, in this event, would in fact have been doing its job fully in accordance with the Supreme Court's admonition in Red Lion Broadcasting Co. v. FCC that "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount."[42] The public, that is to say, would have received fair and balanced election coverage; yet CBS would have run afoul of ASCEF's study and, if petitioner and the dissenters would have their way, afoul of the fairness doctrine as well.

The centerpiece of ASCEF's tripartite viewpoint analysis—the equation of the Nixon Administration's statements with the terra firma of the American political center—is thus empirically unsound. How the analysis can lead to the "objective" results purveyed by petitioner is therefore unclear. Had 1972 been the final year in the first administration of Hubert Humphrey, whom President Nixon defeated in 1968, the results of ASCEF's viewpoint analysis might well have been demonstrably different even had public events and the consequent news coverage been strikingly similar.

In addition to the unrealistic and rigid analytical framework imposed on the content of the CBS Evening News, the study contained another disturbing feature. To examine the fairness of CBS's coverage of national security, ASCEF of course had to decide which news items were and which were not of relevance to national security. ASCEF's attempt to particularize this amorphous concept not only further illustrates the extent to which national security does not lend itself to the specificity required to make out a prima facie case, but also reveals another basic methodological flaw in the ASCEF study.

The attempt at particularization began with the identification of the constituents of national security, which, in ASCEF's view were (1) U.S. military and foreign affairs, (2) Soviet military and foreign policy, (3) Chinese military and foreign policy, and (4) Vietnam.[43] Even assuming that ASCEF was correct in confining national security to foreign and military considerations, one can nonetheless detect problems. In this era of triangular diplomacy—the basic premise of which from the American standpoint is that improved relations with China can reflect favorably on our position vis-á-vis the Soviet Union, and vice versa[44] —who is to say that ASCEF's four constituent elements of national security correctly reflect the realities of world politics? If the CBS Evening News, for example, had broadcast a favorable report on discipline in the Chinese army, would this necessarily have merited the Viewpoint C characterization it doubtless would have received at the hands of ASCEF? Is it not the case that Chinese military discipline may worry the

---

41. Senator McGovern, for example, favored a $30 billion reduction in the defense budget and an immediate withdrawal from Vietnam, in contrast to President Nixon's policy of "Vietnamization" and his support of higher levels of defense spending.

42. 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969).

43. Petitioner's brief at 39.

44. This nation's rapprochement with China, which has recently blossomed into full diplomatic recognition, commenced early in 1972; thus triangular diplomacy was a reality during the period dealt with by the ASCEF study.

Soviets more than it worries us, and therefore constitute a point in favor of our national security? If so, should the comment not then have been characterized as Viewpoint A? As this example makes clear, the dynamics of world diplomacy do not lend themselves to the rigid compartmentalization practiced by ASCEF.

The problems with the ASCEF study do not end here. How realistically can one draw the lines necessary to delimit the four above-mentioned categories, assuming *arguendo* their validity? The category of Chinese military and foreign policy was, in one instance, said by ASCEF to include the following statement of a restaurant owner recently returned to this country from a trip to China:

> [Chinese children] were only exposed to mainly [*sic*] songs and dances with a touch of revolutionary fervor. The dances, the shows, the music and so on concentrated largely on patriotism, social justice, dedication to work, patience, and above all, selfless service to the public.
> \* \* \* [45]

If this is a statement on Chinese foreign and military policy, then it would seem, to draw upon one of countless conceivable examples, that a report on the patriotism, dedication to excellence, and backwoods acumen of the Boy Scouts of America would be a statement on American foreign and military policy.

The plain fact is that ASCEF was not successful in selecting the news items in a realistic way. Nor can we say that rationality ruled in the absence of realism, for ASCEF furnishes no guidelines on how it selected the news items. Except for the mere assertion of the four rather porous categories themselves, we are left wondering whether the process of categorizing CBS news items was subject to any rational constraints.

The many and fatal shortcomings of the ASCEF study are apparent. The question then arises whether any study as ambitious and broadly based as the present one—that is, one that attempts systematically to establish patterns of bias in news broadcasting that have existed over a substantial period of time—could succeed in the fairness doctrine context, where First Amendment considerations dictate surgical precision in the regulation of communications. I believe such a study can succeed, but it must be shaped to fit the contours of the fairness doctrine rather than expecting the fairness doctrine to conform to its imperatives.

First, the study must be structured around a highly specific issue,[46] one that can be defined with precision and can be addressed and responded to directly and efficiently by the broadcaster. Both this opinion and the majority opinion have canvassed the First Amendment interests at stake here, and there is no need to repeat them. Suffice it to say that issue ambiguity in the fairness doctrine context is a certainty to lessen the free flow of information favored by the First Amendment, and is therefore unacceptable.

Second, the study must reflect a high level of qualitative correspondence between its narrowly defined issue and the subjects dealt with by the news items evaluated in the study. In fact, one ought reasonably to be able to deduce from a knowledge of the issue itself that an evaluated subject is a constituent element. For instance, one can deduce from a knowledge of strip mining, an issue that has been the basis of a successful fairness doctrine complaint,[47] that the subject of reclamation of strip mined land is a constituent element of the strip mining issue. In contrast, an impressionistic report on the education of Chinese children cannot be said to bear any organic resemblance to Chinese foreign and military policy, let alone to American national secur-

---

45. E. Lefever, *supra* note 4, at 92.

46. The issue, of course, must also be important and controversial. *See* note 13 *supra* (citing cases).

47. *In re Patsy Mink*, 59 FCC2d 987 (1976) (holding that a West Virginia radio station did not present sufficient coverage of the strip mining issue).

ity however defined. A deductive relationship between the issue and the indicia employed will help ensure rigor in delimiting the scope of the study.

Third, the study must seek to achieve a true objectivity not based on the spurious notion that any single administration is uniformly centrist in its positions. Although it is futile to attempt to define objectivity in the abstract, the requisite objectivity could perhaps be achieved, at least as to some issues, through comparisons of viewpoints based on quantitative assessments of the *status quo*. For example, the issue of military spending—assuming *arguendo* its specificity, importance, and controversiality— might be analyzed in terms of viewpoints seeking to increase, decrease, or maintain at present level the defense budget.

A study meeting these requirements might well succeed where the present study has failed.

## IV. CONCLUSION

The purpose of the fairness doctrine is to ensure the presentation of differing views on controversial issues of public importance. The FCC and the courts must be receptive to new and innovative ways of measuring broadcasters' compliance with the doctrine. Yet in doing so we must be constantly vigilant so that First Amendment values are not jeopardized in any way, and it is that vigilance which today leads me to agree with the FCC in dismissing petitioner's complaint.

BAZELON, Circuit Judge, concurring:

This case vividly illustrates the substantial constitutional perils inherent in the fairness doctrine.[1] Unlike the personal attack and political editorial components of the fairness doctrine upheld in *Red Lion*,[2] applying the fairness doctrine to daily news coverage poses a serious threat to the independence of the broadcast press.[3]

I heartily subscribe to the basic principle that underlies the fairness doctrine—"the paramount right of the public in a free society to be informed and to have presented to it for acceptance and rejection the different attitudes and viewpoints [on] vital and often controversial issues . . . ."[4] I harbor grave doubts, however, that the fairness doctrine promotes this goal. Certainly, what benefits it may have generated in diversity have been undercut by the tendency of the fairness doctrine to suppress coverage of controversy altogether.[5]

In view of the Commission's disposition of this fairness complaint, it is unnecessary to consider whether the application of the fairness doctrine to daily news coverage, absent bad faith or deliberate distortion,[6] could

1. I have previously voiced my concern over the constitutional implications of the fairness doctrine as applied to news and public affairs programming. *See National Broadcasting Co. v. F. C. C.*, 170 U.S.App.D.C. 173, 228, 244–49, 516 F.2d 1101, 1156, 1172–77 (Bazelon, C. J., dissenting from the order vacating the order granting rehearing), *vacated*, 170 U.S.App.D.C. 252, 516 F.2d 1180 (1974), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976).

2. *Red Lion Broadcasting Co. v. F. C. C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

3. The peculiar dangers posed by fairness complaints against daily news coverage are ably described by Judge Tamm, Maj. op. at —— —— of 197 U.S.App.D.C., at 458–459 of 607 F.2d.

4. Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246, 1249 (1949); *see Red Lion Broadcasting Co. v. F. C. C., supra*, 395 U.S. at 389–90, 89 S.Ct. 1794.

5. *See, e. g.,*, The Handling of Public Issues under the Fairness Doctrine and the Public Interest Standards of the Communications Act, 30 F.C.C.2d 26, 35 (1971) (Johnson, Comm'r, concurring); Comment, *Enforcing the Obligation to Present Controversial Issues: The Forgotten Half of the Fairness Doctrine*, 10 Harv. Civ.Rights-Civ.Lib.L.Rev. 137, 154 (1975). The counterproductive effects of the fairness doctrine are exacerbated by the Commission's focus on part two of the fairness doctrine (the "balance" requirement), while it virtually ignores part one (the "coverage" requirement). *See generally*, S. Simmons, The Fairness Doctrine and the Media, 166–73 (1978), Comment, *supra, passim.*

6. Even in the absence of the fairness doctrine, the F.C.C. would be empowered to consider deliberate news distortion or failure to cover news that "could not in good faith be ignored," *National Org. for Women v. F. C. C.*, 181 U.S. App.D.C. 65, 73, 555 F.2d 1002, 1010 (1977), in conjunction with license renewal proceedings.

ever meet the FCC's statutory mandate[7] or the dictates of the First Amendment. I agree completely with Judge Tamm's careful and thorough analysis of the inadequacies of petitioners' prima facie complaint. We need go no further at this time.

As Judge Tamm notes,[8] the fairness doctrine has traditionally found its justification in the scarcity of broadcast frequencies. As that factual predicate is called into question,[9] courts may well be required to reassess the statutory and constitutional validity of the fairness doctrine's restraints on the independence of broadcast journalism. Such a reexamination, however, must await another day.[10]

WILKEY, Circuit Judge, with whom join MacKINNON and ROBB, Circuit Judges, dissenting:

We would reverse the Commission's order as an abuse of discretion.

The fairness doctrine requires that broadcasters afford a reasonable opportunity for the presentation of contrasting views on controversial issues of public importance.[1] Although the fairness doctrine has been upheld by the Supreme Court[2] and been given statutory recognition by Congress,[3] "important constitutional questions contin-

ue to haunt this area of the law."[4] We would have thought that none of these questions is presented here, for in this case we confront not the merits of ASCEF's fairness complaint, but rather the threshold question of whether ASCEF made out a *prima facie* violation. The majority, however, apparently in view of these constitutional questions, has seen fit to convert the *prima facie* evidence standard into an open-ended "prudential" doctrine allowing the Commission to decline jurisdiction over hard cases. Because, unlike the majority, we find the Commission's stated reason for avoiding the merits in this case wholly unsatisfying, we dissent.

## I. BACKGROUND

### A. *Facts.*

ASCEF in a nonprofit educational institution dedicated to enhancing public awareness of facts and issues concerning this country's "national security." In recent years, ASCEF's members have perceived what they regard as a bias toward "dovish" positions in the major television networks' coverage of national security questions. In order to verify this perception, ASCEF determined in December 1972 to undertake an exhaustive and scientific study of network

---

7. The fairness doctrine, developed under the general public interest standard of the 1934 Communications Act, 47 U.S.C. § 309(a) (1976), was "ratified" by Congress in 1959, when it amended § 315(a) of the Act to exempt certain news coverage from the equal time requirement. The amended 315(a) provides in pertinent part that the exemptions from the equal time provision do not relieve broadcasters "from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." 47 U.S.C. § 315(a) (1976).

8. Maj. op. at ——–—— of 197 U.S.App.D.C., at 441–442 of 607 F.2d.

9. *See Brandywine-Main Line Radio, Inc. v. F. C. C.*, 153 U.S.App.D.C. 305, 364–365, 473 F.2d 16, 75–76 (1972) (Bazelon, C. J., dissenting), *cert. denied*, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973).

10. The Supreme Court, in *Red Lion*, left open the possibility that the constitutional implications of the fairness doctrine might require

reexamination if experience should demonstrate that the doctrine failed to promote diversity. *Red Lion Broadcasting, Inc. v. F. C. C., supra*, 395 U.S. at 393, 89 S.Ct. 1794.

1. *See, e. g., Fairness Report*, 48 F.C.C.2d 1, 8 (1974). The fairness doctrine also imposes on broadcasters an antecedent, affirmative obligation to provide coverage of controversial and important issues. *See National Citizens Comm. for Broadcasting v. FCC*, 186 U.S.App. D.C. 102, 107 & n.13, 24, 567 F.2d 1095, 1100 & n.13, 1111 (1977). ASCEF has not charged that CBS failed to devote a substantial amount of broadcast time to coverage of news concerning U.S. national security.

2. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

3. 47 U.S.C. § 315(a) (1970 & Supp. V 1975).

4. *Straus Communications Inc. v. FCC*, 174 U.S. App.D.C. 149, 156, 530 F.2d 1001, 1008 (1976).

news programs. Although ASCEF initially set out to examine all three major television networks, cost and time constraints dictated that it confine its attention to one. CBS was chosen because it had the largest news audience and the greatest number of affiliated stations.

ASCEF endeavored to structure the study so as to ensure as far as possible its independence and objectivity. It assembled a team of eleven research analysts, primarily independent consultants drawn from outside ASCEF who possessed advanced academic degrees. Ernest W. Lefever, a Senior Fellow at the Brookings Institution, was chosen to coordinate the research and write a report on its findings. An Independent Review Panel, consisting of eight scholars with established academic and diplomatic credentials, was organized to scrutinize the work in progress, including research procedures and tentative findings, and to prepare written comments on the final draft manuscript before publication.

The research staff based its study on videotapes of CBS news programs obtained from the news archives at Vanderbilt University. Transcripts were made of all CBS Evening News telecasts broadcast during 1972.[5] From the transcripts the researchers culled all news items falling within four topic areas thought likely to produce references to national security: U.S. military and foreign affairs (including the U.S.–U.S. S.R. military balance); Soviet military and foreign policy; Chinese military and foreign policy; and Vietnam affairs. This examination produced 1,396 news items. Items that consisted of reports of events (e. g., Vietnam battlefield and casualty reports) were eliminated from consideration, since efforts to identify hidden viewpoints within these items produced disparate conclusions. To minimize subjectivity further, the researchers decided to ignore the audiovisual background of the news items, as well as the vocal inflections and facial expressions of commentators and other persons. This winnowing process left 274 explicit opinions expressed by "newsmakers" or voiced by CBS correspondents.

These 274 news items were subjected to a "viewpoint analysis" which formed the core of ASCEF's fairness doctrine complaint. Under this analysis, which resembled a three-option approach used by the Brookings Institution in analyzing the U.S. budget,[6] each news item was coded "A", "B", or

5. At the outset, ASCEF apparently intended to study videotapes of the Evening News for both 1972 and 1973. Brief of ASCEF at 3. In April 1973, however, shortly after CBS was notified of ASCEF's impending study, the network began copyrighting the Evening News. In December 1973, CBS sued to enjoin Vanderbilt from recording the Evening News and to surrender all copies of past copyrighted programs. *CBS, Inc. v. Vanderbilt Univ.*, Civ. No. 7336 (M.D.Tenn.) (dismissed without prejudice, 20 Dec. 1976). Whether for this or for other reasons, ASCEF eventually decided to study videotapes only for 1972; it analyzed Evening News programs for 1973 on the basis of indices and abstracts prepared by the Vanderbilt University news archives. Data drawn from the 1973 programs was not subjected to the "viewpoint analysis" described in the text, but to a "topic" and "theme analysis." This analysis, while it formed a major part of ASCEF's report, did not figure largely in its fairness doctrine complaint. The majority notes, maj. op. at 607 n. 9 of U.S.App.D.C., at 442 n. 9 of F.2d, that only the 1972 videotapes were subject to the viewpoint analysis, but does not explain the circumstances of videotape inaccessibility in 1973.

The research staff also did a "theme analysis" of 23 CBS News Specials and 14 "60 Minutes" programs broadcast in 1972. These programs were selected because they dealt with national security, defense, or foreign policy. *See* E. Lefever, TV and National Defense 195 (1974), *furnished as* Supplemental Joint Appendix [hereafter cited as S.J.A.].

6. *See* S.J.A. at 78, *citing* C. L. Schultze, Setting National Priorities: The 1971 Budget 18–29 (1970):

The Brookings authors in 1970 developed the concept of alternative *low, medium,* and *high* defense budgets for both strategic and general purpose forces. The *medium budget* corresponded approximately to what the President had requested for fiscal year 1971, which was $72.3 billion. The *low budget,* based on a different assessment of the external threat and of America's responsibility in the world, came out at $48 billion, while the *high budget,* which assumed a greater threat and greater U.S. responsibilities, came to $77 billion. The Brookings study applied the three-option device for budget analysis to all domestic and foreign policy programs and

"C", according to the viewpoint expressed on U.S. national security:[7]

Viewpoint A holds that the threat to U.S. security is more serious than perceived by the government or that the United States ought to *increase* its national security efforts; *Viewpoint B* holds that present government threat perception is essentially correct or U.S. military and foreign policy efforts are adequate, and *Viewpoint C* holds that the threat to U.S. security is less serious than perceived by the government or that U.S. national security efforts should be *decreased*.

To facilitate understanding of this coding system, ASCEF provided a chart,[8] giving examples of typical A, B, and C viewpoints on eight major national security subjects.

The 274 coded news items were broken down into sentences, and these sentences were tabulated to reveal the relative frequency of the three viewpoints. In sum, the study indicated that the CBS Evening News in 1972 presented viewpoint C (doing less about national security) 61.83% of the time, viewpoint B (the current government position) 34.63% of the time, and viewpoint A (doing more about national security) 3.54% of the time. The researchers recognized that the overwhelming preponderance of C views owed largely to references about the Vietnam War. Even when references to Vietnam were excluded, however, C views outnumbered A views by a ratio of three to one.[9]

The results of the study were examined by the Independent Review Panel in April and August 1974, and published in a 209-page report released on 23 October of that year. The report, entitled *TV and National Defense: An Analysis of CBS News, 1972–73,* contains an elaborate description of methodology and detailed statistical findings. Not surprisingly, it stirred considerable response from the press.[10]

Shortly before releasing the report, ASCEF sent a copy to CBS, set forth its charges of distortion and imbalance, and requested that the network take corrective action. After some additional correspondence, CBS notified ASCEF on 23 April 1975 that it found no violation of the fairness doctrine and that no response to ASCEF's complaint was called for.

ASCEF thereupon determined to update its 1972–73 data "[i]n order to determine whether CBS–TV News ha[d] continued its policy of failing to provide a reasonable opportunity for the expression" of contrasting viewpoints on national security.[11] ASCEF purchased microfiche copies of CBS–TV Evening News scripts for 1975 and of all CBS–TV News programs (except "Face the Nation") beginning with January 1976. In addition, ASCEF monitored and recorded all CBS–TV News Programs for the latter two weeks of May 1975 (a randomly selected period) and for the entire month of May 1976 (the month immediately preceding ASCEF's preparation of its complaint). In reviewing these programs ASCEF "found no significant change in the pattern of viewpoint coverage reported in the basic Study."[12]

### B. Course of the Litigation.

On 8 September 1976 ASCEF filed a twenty-one-page complaint with the FCC charging that CBS–TV News had violated

---

used it with adaptations in the four subsequent budget studies.

7. S.J.A. at 78 (emphasis original).

8. *Id.* at 79. The chart has been reproduced as Appendix A to this opinion.

9. *Id.* at 87. The instant action is not the only case in which a distortion of the news in covering the Vietnam War has been alleged against CBS. Colonel Anthony Herbert sued CBS for libel, charging that CBS deliberately distorted its presentation of the news in regard to his personal activities by omitting film which would have shown him in a more favorable light and presented a more balanced view. Colonel Herbert alleged deliberate bias and malice, *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); no deliberate bias is charged by the petitioners herein.

10. *See* Joint Appendix (J.A.) at 23.

11. Complaint, J.A. at 12.

12. *Id.* at 13.

the fairness doctrine by its "persistent pattern of lopsided treatment of national security issues."[13] The complaint elaborated a description of the A–B–C coding system and a summary of the report's findings; a copy of the 209-page report itself was furnished as an exhibit. ASCEF asked that the Commission designate the complaint for a hearing on the merits. In its order released 15 March 1977 the FCC found that "no Commission action [was] warranted" inasmuch as the complaint failed to establish a *prima facie* case of noncompliance with the fairness doctrine.[14]

## II. ANALYSIS

The fairness doctrine is itself not directly in question in this case. The issue before us is rather more modest. As stated by the majority, the question is simply whether ASCEF's complaint presented *prima facie* evidence of a violation of the fairness doctrine sufficient to warrant an FCC inquiry to CBS. The Commission, with whom the majority agrees, thought that it did not.

We cannot help but sense that something more serious than a mine run question of *prima facie* evidence has been decided today. The tone and rationale of the majority opinion suggest that the wagons are being drawn about the fairness doctrine in a fashion assured to deflect the most worrisome fairness complaints—those, like petitioner's, alleging pervasive and continuous imbalance in the coverage of controversial matters. To be sure, the measurement and remedy of chronic "unfairness" raises novel

and acutely difficult constitutional questions. And we mean to intimate no view of the precise shape of this frontier. We do, however, find it most regrettable that the majority does not confront these questions, instead carving an ill-defined safe harbor into which the Commission may sail when the waters are rough.

Moreover, as is evident from the majority's rationale, the *prima facie* evidence test is a rather improbable safe harbor. Not only does the majority's position run headlong into the settled application of the *prima facie* standard, but also it infuses the standard with an element of discretion, and hence vagueness, painfully at odds with the precision customarily required of regulation affecting speech. Contrary to the majority's assertion, there is simply no warrant in law for the sort of free-wheeling "balancing" of interests under cover of the *prima facie* evidence test which the court today approves, and thus from which we must dissent.

As previously understood, the *prima facie* evidence test served a limited screening function. The requirement of a *prima facie* showing places the initial burden on the complaining party.[15] This threshold allocation of burdens is rationalized by first amendment concerns: by preventing broadcasters from being saddled with the task of "answering idle or capricious complaints," the Commission endeavors as far as possible to eschew interference with their programming discretion.[16] The requisites of a *pri-*

---

13. J.A. at 7.

14. 63 F.C.C.2d at 370. The majority opinion notes that in 1973 there were 94 complaints to which the FCC required the filing of a response. Maj. op. at —— of 197 U.S.App.D.C., at 447 of 607 F.2d. We wonder if any one of these 94 complaints was better documented and more thoroughly analyzed than the complaint in the instant case. Moreover, we wonder if it can be fairly said that *all* the 94 complaints, to which a response was required, more sharply and clearly defined the issue than was done in the instant case. *See* pp. —— —— of 197 U.S.App.D.C., at 465–469 of 607 F.2d *infra.*

15. *National Citizens Comm. for Broadcasting v. FCC,* 186 U.S.App.D.C. 102, 118, 567 F.2d 1095, 1111 (1977); *Democratic Nat'l Comm. v. FCC,* 148 U.S.App.D.C. 383, 403, 460 F.2d 891, 911, *cert. denied,* 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972); *Reconsideration of the Fairness Report,* 58 F.C.C.2d at 696.

16. A *Reconsideration of the Fairness Report,* 58 F.C.C.2d at 696. *See Democratic Nat'l Comm. v. FCC,* 148 U.S.App.D.C. 383, 399–400, 460 F.2d 891, 907–08, *cert. denied,* 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972) *Robert G. Ryan,* 25 F.C.C.2d 884, 885 (1970) quoting; *Fairness Report,* 48 F.C.C.2d at 8.

*ma facie* case were enumerated in *Allen C. Phelps*,[17] where the Commission stated:

> [I]t has long been our policy normally to require that fairness doctrine complaints (*a*) specify the particular broadcasts in which the controversial issue was presented, (*b*) state the position advocated in such broadcasts, and (*c*) set forth reasonable grounds for concluding that the licensee in his overall programming has not attempted to present opposing views on the issue.[18]

In *Democratic National Committee v. FCC*,[19] we reaffirmed our view that the *Phelps* requirements represented "a 'not unreasonable' standard," and ASCEF specifically disclaims any challenge to those requirements here.[20] Assuming, as does the majority, the validity of the *Phelps* criteria, then, the only question is whether the FCC reasonably complied with its own procedural standards in dismissing ASCEF's complaint.

It is possible to distinguish in the FCC's opinion four intertwined reasons in support of its conclusion that ASCEF's complaint failed to establish a *prima facie* case. The Commission argued (1) that ASCEF did not define the "controversial issue" with sufficient specificity; (2) that ASCEF's evidence did not support its assertion that the programs surveyed were imbalanced; and that ASCEF failed to provide evidence of imbalance in CBS' *overall* programming, either

---

17. 21 F.C.C.2d 12 (1969).

18. *Id.* at 13. The Commission elaborated the requirements of a *prima facie* case in its 1976 *Reconsideration of the Fairness Report*:

> Where complaint is made to the Commission, the Commission expects a complainant to submit specific information indicating (1) the particular station involved; (2) the particular issue of a controversial nature discussed over the air; (3) the date and time when the program was carried; (4) the basis for the claim that the station has presented only one side of the question; and (5) whether the station had afforded, or has plans to afford, an opportunity for the presentation of contrasting viewpoints.

58 F.C.C.2d at 696 quoting *Fairness Doctrine Primer*, 40 F.C.C.2d at 600, 29 Fed. Reg. at 10416. *See Fairness Report*, 48 F.C.C.2d at 19 (same). A seemingly more onerous version of these requirements is set out in *Broadcast Procedure Manual*, 49 F.C.C.2d 1, 5, 39 Fed. Reg. 32288, 32290 (1974):

> If you do file a fairness doctrine complaint with the Commission, a copy should be sent to the station. The complaint should contain specific information concerning the following matters: (1) The name of the station or network involved; (2) the controversial issue of public importance on which a view was presented; (3) the date and time of its broadcast; (4) the basis for your claim that the issue is controversial and of public importance; (5) an accurate summary of the view or views broadcast; (6) the basis for your claim that the station or network has not broadcast contrasting views on the issue or issues in its overall programming; and (7) whether the station or network has afforded, or has expressed the intention to afford, a reasonable opportunity for the presentation of contrasting viewpoints on that issue.

19. 148 U.S.App.D.C. 383, 399, 460 F.2d 891, 907, *cert. denied*, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972) quoting *Hale v. FCC*, 138 U.S.App.D.C. 125, 128, 425 F.2d 556, 559 (1970).

20. Reply Brief at 1. In recent years, some dissatisfaction with the *Phelps* doctrine has surfaced within the FCC. Commissioner Robinson, dissenting from the 1976 *Reconsideration of the Fairness Report*, noted that the "FCC's enforcement of the fairness doctrine has always been less than rigorous" and that the Commission "has evolved procedural barriers, such as the '*Phelps* Doctrine,'" in the face of increasing demands to redress fairness grievances. *See* 58 F.C.C.2d at 710 (concluding that nonrigorous enforcement is inevitable owing to first amendment concerns). Commissioner Johnson, dissenting in *Diocesan Union of Holy Name Societies*, labeled the *Phelps* requirements as they have evolved a "procedural straight-jacket" which "requir[es] members of the *public* to submit *proof* of something the licensee has *not* broadcast," in effect "den[ying] them a substantive ruling until they meet a burden that, as a practical matter, can never be met." 43 F.C.C.2d at 548–49 (1973) (emphasis in original). Our approbation of the *Phelps* requirements in *Hale* and *Democratic National Committee*—that they were a "not unreasonable" standard—was not exactly a ringing endorsement, and more recently we have noted the "potential for less than full enforcement" of the fairness doctrine that inheres in them. *See National Citizens Comm. for Broadcasting v. FCC*, 186 U.S.App.D.C. 102, 118, 567 F.2d 1095, 1111 & n. 68 (1977). We are not required to address the propriety of the *Phelps* test here.

(3) because it did not survey a broad enough spectrum of the network's news and public affairs programs, or (4) because it did not continue its study for a long enough period of time. We consider these arguments in turn.

### A. Definition of the Issue.

The FCC on several occasions has stressed that a fairness complaint bears the burden of "specifying the particular issue of a controversial nature discussed over the air." [21] In this case, the FCC found that no "well defined issue" had been presented: [22]

> Although the "national security issue" is defined by the complainant as involving "the basic conflict relationship and the relative military balance between the U.S. and the U.S.S.R.," in other parts of the complaint ASCEF refers to the subject of the study as "national defense and foreign policy issues," "Soviet and Chinese political and military objectives," and "domestic foreign policy." Moreover, the data collected in the accompanying study indicates that the complainant's perceived scope of the issue is much broader, encompassing subjects such as Chinese military and non-military policies, Southeast Asia and foreign relations generally.

By failing to define "national security issues" more precisely, ASCEF allegedly "made it impossible for the Commission to determine the actual issue, if any, which the complaint addressed." [23]

A requirement that one specify the issue as the logical starting-point of an analytical undertaking can hardly be gainsaid. It must, however, be approached with a fair amount of common sense. From this vantage point, the FCC's inability to grasp the issue presented here can only be described as a willful obtuseness. ASCEF's complaint and accompanying report, particularly in their elaboration of the A–B–C viewpoint analysis,[24] made the relevant issue as plain as day: whether this nation should *do more, less, or the same* about perceived threats to its national security. Topics like "Soviet military affairs" and "Chinese political objectives" were never posed as "the issue" at all, but were merely subject-areas in which references to "the issue"—the appropriate response to national security threats—typically could be expected to arise. ASCEF put in evidence copies of some thirty newspaper and magazine articles discussing its report; the authors of these articles, regardless of their views on the merits, discerned with perfect comprehension what "the issue" was.[25] Indeed, the FCC in its opinion, *quoted* ASCEF's definition of the three "national security" viewpoints,[26] and it is hard to explain the

---

**21.** *Reconsideration of Fairness Report,* 58 F.C.C.2d at 696:

> This requirement is needed so that complainants, licensees and the Commission will have a clearer understanding of the positions of the parties. This is particularly true because once the burden of specificity has been placed upon the complainant, our attention and that of the licensee is then directed to the issue as framed by the complainant. We do not intend to be placed in the position of specifying the alleged controversial issue of public importance in a complaint. It is not the proper function of the administering agency to frame the complaints coming before it and it is incumbent upon the complaining party to bring before us a *prima facie* complaint.

*See Fairness Report,* 48 F.C.C.2d at 12–13.

**22.** 63 F.C.C.2d at 368.

**23.** Brief of FCC at 23–24.

**24.** J.A. at 8–10; S.J.A. at 75–81.

**25.** In its brief, the FCC asserts that these articles are not part of the record. Brief of FCC at 21 n.19. This assertion, in view of the fact that ASCEF filed the articles as Exhibit B to its FCC complaint, J.A. at 23, is not only unfounded but unprecedented. At oral argument, the FCC suggested that what is specific enough for public consumption might not be specific enough to be digested by the Commission. This suggestion, summoning up images of 19th Century pleading requirements, cannot be countenanced. A requirement that complaints be drafted in "legalese" is particularly inappropriate in the fairness area, where the FCC's enforcement by its own admission depends almost exclusively on "complaints received from interested citizens." *Fairness Report,* 48 F.C.C.2d at 8.

**26.** 63 F.C.C.2d at 367.

Commission's astonishment before the handwriting on the wall.

The issue ASCEF posed—whether this nation should do more, less, or the same about threats to its national security—is a *specific* issue because it is singular, precisely formulated, and explicit.[27] The issue is admittedly a *large* one, but no larger than other major issues (such as abortion,[28] or cigarette advertising[29]) with which the Commission in fairness cases has dealt. The issue is likewise a *multifaceted* one, but no more multifaceted than other major issues (such as "women's liberation"[30] or children's advertising[31]) which the Commission in fairness cases has considered. An issue's size and complexity, in any event, do not impugn its specificity or singularity, and we think that ASCEF's definition of the issue was plainly sufficient to cross the threshold of a *prima facie* statement here.

The specificity requirement, as we have noted above, has a pragmatic purpose, and it should be pragmatically employed. The FCC in the past has shown some ingenuity in extracting specificity from a variegated proffer of issues[32] and has suggested on at least one occasion that the specificity requirement is largely precatory.[33] We have discovered extremely few cases in which the FCC has cited nonspecificity as a reason for throwing out a fairness complaint.[34] The complaints in these cases, moreover, were otherwise frivolous, and in view of the well-considered and substantial quality of the complaint in this case the Commission's verdict is virtually unprecedented.[35] "Inadequate definition" must not be used as a device for arbitrarily eliminating fairness complaints which the Commission for some reason may not want to process.[36]

For these reasons, contrary to the majority, we conclude that the FCC abused its discretion in finding that ASCEF's definition of the relevant issue fell short of the specificity required of a *prima facie* case.[37]

27. *See* Webster's New Collegiate Dictionary 812 (1959).

28. *E.g., Michael McKee,* 49 F.C.C.2d 1258, 1259 (1974); *Voice for Innocent Victims of Abortion,* 42 F.C.C.2d 335, 336 (1973).

29. *E.g., WCBS–TV,* 9 F.C.C.2d 921, 938 (1967), *aff'd sub nom. Banzhaf v. FCC,* 132 U.S.App. D.C. 14, 405 F.2d 1082 (1968), *cert. denied,* 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

30. *E.g., Females Opposed to Equality,* 42 F.C.C.2d 434, 435 (1973).

31. *E.g., Council on Children v. ABC & CBS,* 59 F.C.C.2d 448, 452 (1976) (issue was "whether, in view of a child's inability to critically evaluate advertisements, children should ever be exposed to commercials that urge them to use, consume and purchase various products unless those children are also informed as to the techniques and purposes of product advertising").

32. *See Council on Children v. ABC & CBS,* 59 F.C.C.2d 448, 452 (1976) (concluding that petitioner's "three characterizations of the controversial issue of public importance . . . are, essentially, one and the same in their basic thrust").

33. *See Fairness Report,* 48 F.C.C.2d at 21 ("it would be a great assistance to the Commission, and would greatly expedite the handling of complaints, if all parties would be as specific as possible in defining the controversial public issue involved in the programs complained of");

*id.* at 12–13 (suggesting that main definitional question is whether issue in broad terms was actually *raised* in program complained of).

34. *E.g., Hakki S. Tamimie,* 42 F.C.C.2d 876, 877 (1973) (complaint inadequate, *inter alia,* where it states that "the issue is the 'Middle East,' but fails to specify the particular aspect of the general topic which was discussed").

35. The Commission's citation of *Green v. FCC,* 144 U.S.App.D.C. 353, 447 F.2d 323, 329 (1971), Brief of FCC at 19–20 & n.17, is inapposite. In *Green* we acknowledged that in any fairness case "it is first necessary to define the issue," and found "five different issues" intermingled in the parties' legal papers. *See* 144 U.S.App. D.C. at 359, 447 F.2d at 329. Far from holding that the complaint's nonspecificity was fatal, however, we went on to consider the merits of the fairness doctrine claim on *each* of the five possible constructions of "the issue." *Id.* at 359–61, 447 F.2d at 329–31.

36. *Cf. National Cable Television Ass'n v. FCC,* 156 U.S.App.D.C. 91, 98–9, 479 F.2d 183, 190–91 (1973) (FOIA requirement that requester provide reasonable description of "identifiable records" cannot be used by agency as a device for withholding documents).

37. The FCC did not reach the question of controversiality because it found that ASCEF failed to state a well-defined issue. Brief of FCC at 20 n.18. On at least one other occa-

The essence of the majority position is its holding "that ASCEF failed to base its complaint on a particular, well-defined issue because . . . the indirect relationships among the issues aggregated by ASCEF under the umbrella of 'national security' do not provide a basis for determining whether the public received a reasonable balance of conflicting views, . . . "[38] The majority then develops its "umbrella" concept by asserting "[t]he broadcasts ASCEF studied involved issues as distinct as America's commitment to the [NATO], detente with China, . . . "[39]

As we have pointed out above, the *issue* as defined by the viewer—and the viewer has both the right and the obligation to define the issue—was plain as day: *whether this nation should do more, less, or the same about perceived threats to its national security.* The topics listed by the majority as "issues" might very well be defined as separate issues, *if* the viewer desired to charge CBS with unbalanced broadcasts on any one of these single topics. But the viewer here did not choose to define the issue this way; instead, the issue was defined in the complaint as national security. With the issue so defined—whether this nation should do more, less, or the same about perceived threats to its national security—the topics listed by the majority simply are *subject areas* in which references to "the issue" could be expected to arise in a CBS broadcast.

Obviously, issues—and sub-issues—can be framed in many ways. The viewer can be required to define *an identifiable issue*, and ASCEF did this in its complaint, but the viewer *cannot* be required to define an issue just as the FCC or the court would prefer. The FCC has repeatedly emphasized that the viewer is privileged to state his complaint in layman's language, and that legal precision is not necessary. This has to be so, because the fairness doctrine rests upon viewer analysis and enforcement. What the FCC received here from ASCEF was indeed a very comprehensive, thorough, and scholarly analysis, with the issue of national security stated precisely and in a way which nobody but the FCC and CBS for their own reasons failed to understand. None of the thirty commentators who wrote in the public press about the ASCEF study and the complaint to the FCC on the CBS bias failed to understand the issue and the charge on that issue which ASCEF was making.[40] Now the majority of this court inexplicably joins the obfuscators.

If the position taken by the FCC and this court is sustained, it would be very difficult to make *any major issue* in American life the subject of a fairness complaint. This is shown by the majority's assertion that the relationships of the subject areas comprising the issue of national security to one another are "tangential,"[41] and that views on any one of these subject areas could not "conflict with or support" a point of view on another subject area. As indicated above, what the majority defines—ignoring the right of the viewer to define the issue on which he wishes to make a complaint—as obligatory issues are nothing but subject areas or sub-issues under the viewer-defined issue of national security. Each subject area or sub-issue is a component part of the overall issue of national security—doing more, less, or the same about perceived threats to our national security. A stated viewpoint on one of these subject areas or sub-issues "conflicts" with or "supports" another—in a different subject area category—*only* when all the viewpoints on the different subject areas are added up under the overall issue of national security

sion, however, the Commission has stated, "It is generally recognized that '[t]he question of US–USSR military relations' is a controversial issue of public importance." Letter of FCC to Gaylord Broadcasting Co., 20 April 1977, *reprinted in* J.A. at 111.

**38.** Maj. op. at —— of 197 U.S.App.D.C., at 448 of 607 F.2d.

**39.** Maj. op. at —— of 197 U.S.App.D.C., at 449 of 607 F.2d.

**40.** *See* J.A. at 23.

**41.** Maj. op. at —— of 197 U.S.App.D.C., at 449 of 607 F.2d.

to see what was the predominant CBS viewpoint.[42]

The majority opinion ignores the fact that where a large amount of data is surveyed, e.g., two full years of television broadcasts on the CBS Evening News, plus additional study of limited periods of time in those and other years, the only way such a large survey can be tabulated is to analyze the defined issue in terms of its component subject areas or sub-issues. The majority's assertion that "[i]f ASCEF had focused on individual issues, it could have identified the actual views expressed instead of superimposing artificial A, B, and C viewpoints on the broadcasts studied," [43] thus fails to recognize that only the most limited subject area, limited in concept and number of broadcasts analyzed, could have been studied in the majority's recommended fashion. Where a large amount of data is surveyed, even with a limited concept defined, it is essential to classify the viewpoints expressed instead of dealing with the phraseology of each individual broadcast, as the majority seems to think could be tabulated.

As we have indicated earlier, the "A, B, and C viewpoints" are not "artificial." They are scientific classifications, used by the Brookings Institution in its study of the national budget (which is in itself a pretty gigantic issue), by CBS itself in its attempted refutation of a book analyzing its broadcast policy, and by other institutions such as the Foreign Policy Association in taking polls. It was precisely because this method of analysis had been so widely used and accepted as valid in defining points of view on various public issues, such as the national budget, that it was employed by ASCEF in this particular study.[44]

Moreover, even were the majority's concept of the overbroad "unbrella" issue an appropriate criterion, there is in this case ample evidence of imbalance separately concerning several of the precise "component" issues which the majority conceded were sufficiently specific. For example, ASCEF adduced evidence separately with regard to (1) U.S. involvement in Vietnam, (2) Soviet foreign policy objectives, (3) detente with the Soviet Union, (4) the appropriate relative military postures of the U.S. and the U.S.S.R., and (5) U.S. military expenditures and SALT. To be sure, ASCEF supposed that the Commission would have no difficulty perceiving the nexus between these subjects and the core issue of national security, a supposition which we find more than excusable, if overly sanguine. However, having declined to aggregate the subjects as ASCEF proposed, the Commission was at the very least obliged to consider the subjects separately, as would have been straightforward given the thoroughness of ASCEF's complaint. We are at a loss to explain why the Commission did not do this.

We find even more worrisome the majority's toleration of such an obvious error in the Commission's reading of the complaint. There is nothing subtle or indirect about the pleadings upon whose adequacy we are asked to pass. *It is plain that the complaint on its face alleges imbalance concerning*

---

42. The majority's examples of ASCEF's viewpoint classification understate appreciably the logical connections which exist among views on the various national security questions. *See* maj. op. at —— of 197 U.S.App.D.C., at 449 of 607 F.2d. We believe such selective recitals of the record are both unfair to ASCEF's proof and in any case irrelevant *since ASCEF also analyzed the several issues separately. See* p. —— of 197 U.S.App.D.C., p. 468 of 607 F.2d *infra.* A fair reading of the complete record discloses a nexus between the categorized views at least sufficient to describe a coherent issue. *See, e.g.,* S.J.A. at 81–85, 90–92. Whether the compilation of views would permit ASCEF

to prevail ultimately on the merits of its complaint is, as we have said all along, not before us.

43. Maj. op. at —— of 197 U.S.App.D.C., at 450 of 607 F.2d.

44. The coordinator of research and writer of the report was Ernest W. Lefever, a Senior Fellow at the Brookings Institution, who apparently was familiar with this method of analysis from his work there. For a more complete description of the study's methodology see Appendix C of this opinion.

*issues sufficiently narrow for the majority.*[45] Ironically, petitioner's "inartful" pleading would apparently pass muster in any federal district court.[46] Under the Federal Rules, only a "short and plain statement of the claim" is required,[47] a condition obviously satisfied by petitioner's complaint. "Throwing people out of court" on overly formal pleading grounds is especially inappropriate in the fairness area, where the FCC's enforcement by its own admission depends almost entirely on "complaints received from interested citizens."[48] Surely a complaint by laymen should not be judged by stricter standards than a court would apply to a lawyer's pleading.

While the majority affirmed the Commission's dismissal of the complaint by sustaining it on the question of definition of the issue, and thus did not need to consider the other three asserted bases for the Commission's dismissal, it is necessary for this dissent to do so, for in our view the other three asserted grounds were as equally devoid of merit as the first.

**B. Evidence of Programming Imbalance.**

In order to demonstrate a *prima facie* violation of the fairness doctrine, the complainant must indicate "the basis for [his] claim that the station has presented only one side" of the issue in question.[49] ASCEF indicated the basis for its claim that CBS had presented only one side of the national security issue by means of a statistical study showing that the network broadcast C viewpoints (doing less about national security) seventeen times more frequently than it broadcast A viewpoints (doing more about national security).

The FCC attacked the evidentiary basis for ASCEF's claim primarily by questioning the methodology of its viewpoint coding system. Some coded viewpoints, the Commission argued, bore no logical relation to national security; others, while logically relevant to national security, were improperly coded on the A–B–C spectrum. The Commission cited one example of each sort of alleged misclassification;[50] on the basis of these two examples, it concluded that ASCEF failed to present "adequate rele-

---

**45.** Chief Judge Wright's colorful opinion similarly ignores the evidence separately documenting issues which he would find comfortably narrow. Regrettably, the "cursory glance at petitioner's papers," 197 U.S.App.D.C. at ——, 607 F.2d at 455 (Wright, C.J., concurring), which disclosed to the Chief Judge the existence of these subsidiary issues, failed to apprise him of the supporting data.

It would be quieting then if the portion of the Chief Judge's opinion addressing the methodology of the ASCEF study could be read as an alternative and more satisfactory basis for the majority's result. Unfortunately, this is not possible. After reciting a number of disputable propositions concerning the limits of petitioner's viewpoint analysis, Chief Judge Wright *concedes that the issue of military spending* would be susceptible to the analysis, 197 U.S. App.D.C. ——, 607 F.2d 459 (Wright, C.J., concurring), assuming that that issue were sufficiently specific and that the documented news items "qualitatively corresponded" to the issue. *Id.* at ——–—— of 197 U.S.App.D.C., at 458– 459 of 607 F.2d. Of course, petitioner did proffer evidence of an imbalance of views on military spending, Complaint, J.A., at 10, but because the FCC refused to pursue the matter, we do not know whether petitioner's claim entirely satisfies Chief Judge Wright's criteria. I am at a loss to understand why the Chief Judge would not remand this case in order to find out.

**46.** *See, e.g., Dioguardi v. Durning*, 139 F.2d 744 (2nd Cir. 1944)(Clark, J.).

**47.** Fed. R. Civ. P. 8(a)(2).

**48.** *Fairness Report*, 48 F.C.C.2d at 8.

**49.** *Fairness Doctrine Primer*, 40 F.C.C. at 600, 29 Fed. Reg. at 10416, *quoted in Reconsideration of the Fairness Report*, 58 F.C.C.2d at 696.

**50.** As an example of the first type of misclassification the FCC cited the coding of viewpoints on "Chinese non-military affairs." Such viewpoints, it said, could not be "classified under headings dealing with the 'threat to U.S. security' without the subjective conclusion being reached" that an opinion on one issue (*e.g.,* praise for Chinese social reforms) necessarily implies an opinion on the other (*e.g.,* "softness" on Communism). *See* 63 F.C.C.2d at 369. As an example of the second type of misclassification the FCC cited the coding of "opposition to the B–1 bomber as viewpoint C." *Id.* at 369 n.3. This classification, it said, ignores "opposition by those who believe that the bomber is not the most effective weapons system," a viewpoint that might be classified (depending on current governmental policy) as A or B.

vant evidence of a violation of the fairness doctrine." [51]

We believe that the FCC's conclusion was arbitrary for three reasons. First, neither of the Commission's examples *proves* any flaw in ASCEF's analysis. They evidence, at most, *arguable* misclassification; whether they are misclassifications in fact depends on their content and the context in which they appeared.[52] Without texts of the items broadcast, the FCC simply did not have sufficient information to make judgments on close questions raised by ASCEF's evidentiary showing.

Second, even if the FCC's two examples manifested clear coding errors, they would not necessarily eviscerate ASCEF's tender of proof. ASCEF's report coded almost 300 news items, broken down into several thousand sentences. A fair-minded evaluation of this evidence must frankly confront the *bulk* of the complaint; it cannot rest content with the citation of two, five, or ten lapses that do not fairly represent the whole.

Third, and most important, the type of detailed evidentiary challenge on which the Commission based its dismissal here is simply inappropriate at the *prima facie* stage of a fairness doctrine proceeding. *The soundness of ASCEF's methodology and the probativeness of its particular examples are questions for the merits, to be resolved on* the basis of responsive submissions by the network and the complainant. They are not questions that must unanimously be answered in favor of ASCEF before an inquiry is even made to the licensee. To require that a complainant at the outset demonstrate his case beyond cavil is to transmute the requirement of a *prima facie* showing into an *ex parte* evidentiary decision on the merits.[53] Such a transmutation would render the fairness doctrine, whose enforcement depends almost exclusively on viewer-initiated complaints,[54] a dead letter.

Such a transmutation, moreover, is flatly inconsistent with the FCC's expressed procedural standards. In its 1974 *Fairness Report* the Commission discussed what a complainant had to do to "indicate the basis for a claim" of programming imbalance. "[I]f several regular viewers or listeners join together in a statement that they have not heard a presentation of [the neglected] viewpoint," the Commission said, the evidentiary burden of a *prima facie* case normally would be met: [55]

> The fact that regular viewers or listeners have not been exposed to an opposing viewpoint is obviously not conclusive evidence that the viewpoint has not been presented, but it does indicate that there is a reasonable basis for the viewer's conclusion that such is the case. See *Alan C.*

51. *Id.* at 369.

52. Viewpoints on "Chinese non-military affairs" probably would be relevant to the national security issue, for example, if they held that China had abjured expansionist goals and decided to devote its resources wholly to domestic social programs. Coding "opposition to the B–1 bomber" as viewpoint C probably would be correct, for example, if the opponent expressed a belief that this country's armaments were already superior to the Soviet Union's and that the B–1 bomber would only irritate that nation unnecessarily. *See* pp. —— – —— and n.8 of 197 U.S.App.D.C., pp. 461–462 and n. 8 of 607 F.2d *supra.*

53. The majority opinion faults petitioner's complaint, as did the FCC opinion even more, on grounds that surely could only be determined on the merits, and have nothing whatsoever to do with whether the complaint stated a *prima facie* case. For example, the majority opinion, note 39, raises the question whether "ASCEF could have shown that positions on its 'national security issue' were 'meaningfully discussed' throughout the challenged broadcast," and, in note 40, whether "a broadcast concerning the role of women in the armed services sufficiently relate[d] to national security to be included in [this] analysis." Certainly these and other similar questions raised can only be answered by a study of all the 274 news items which were subjected to the "viewpoint analysis," of those items which were excluded, and by a comprehensive evaluation of the entire study; all of which is a matter for the merits and could never be fairly evaluated in relation to a *prima facie* case.

54. *See* note 25 *supra.*

55. 48 F.C.C.2d at 20 (emphasis added). *See Broadcast Procedure Manual,* 49 F.C.C.2d 1, 6, 39 Fed. Reg. 32288, 32290 (1974) (same).

*Phelps,* 21 FCC2d 12 (1969). Accordingly, we believe that it is a sufficient basis for a Commission inquiry to the station.

In this case, a host of "regular viewers" joined together not only in a "statement," but in an elaborate statistical analysis showing that they had not heard a balanced presentation of viewpoints on national security. By so doing, they "indicated the basis for their claim" of imbalanced programming and satisfied the evidentiary requirements of a *prima facie* case. The Commission acted arbitrarily in concluding otherwise.

### C. *Scope of Complainant's Study.*

The fairness doctrine requires a licensee to provide for expression of opposing views *in his overall programming;* it does not require him to offer a forum for such views in the same program or series of programs. In order to establish a *prima facie* violation of the fairness doctrine, accordingly, a complainant must state his reasons for concluding that the licensee *in his overall programming* has demonstrated imbalance.[56] The Commission found that ASCEF failed to meet this burden here. In its decision, the FCC argued that ASCEF only examined "*selected* programs broadcast by the network for the periods covered by the study, but [did] not make an allegation as to the *overall* news and public affairs programming of the licensee during that time." [57] In its brief the Commission goes further, and faults ASCEF's failure to present evidence of imbalance "in CBS' overall news, public affairs, *and non-entertainment programming.*" [58] Because ASCEF "did not address each programming

component," the FCC concludes, its complaint was properly rejected as a "generalized and unsupported attack." [59]

The requirement that a fairness complainant demonstrate, as part of his *prima facie* showing, the *absence* of contrasting viewpoints in a licensee's *overall* programming is, on its face, quite burdensome. Proving a negative proposition is never easy; it is especially difficult when the subject of which the proposition is predicated goes on twenty-four hours a day, 365 days a year. Recognizing this, the FCC in its *Fairness Report* proffered a narrow and reasonable interpretation of its standard: [60]

> [The *Phelps* doctrine] does not require, as some appear to believe, that the complainant constantly monitor the station. . . . While the complainant must state the basis for this claim that the station has not presented contrasting views, that claim might be based on an assertion that the complainant is a regular listener or viewer; that is, a person who consistently or as a matter of routine listens to the news, public affairs and other non-entertainment programs carried by the station involved. This does not require that the complainant listen to or view the station 24 hours a day, seven days a week. One example of a "regular" television viewer would be a person who routinely (but not necessarily every day) watches the evening news and a significant portion of the public affairs programs of a given station.

On the basis of this published procedural standard, we conclude that the FCC abused its discretion here. ASCEF's complaint as-

---

**56.** *Reconsideration of the Fairness Report,* 58 F.C.C.2d at 695; *Fairness Report,* 48 F.C.C.2d at 8, 19; *Allen C. Phelps,* 21 F.C.C.2d at 13.

**57.** 63 F.C.C.2d at 369–70 (emphasis in original). The Commission found that ASCEF's only allegation as to the network's other programming was a statement that "[t]he same news department prepares the other regular news programs, and there has been no indication or claim that differing standards are used by CBS in preparing these other programs." *Id.* at 370. The Commission found this statement an impermissible attempt to shift to the licensee the burden of proof as to imbalance in overall pro-

gramming. If the statement is so read, the FCC is probably right. But if the statement is read as a logical inference as to where CBS's viewpoints on national security are most likely to be found, the Commission, we think, is wrong. *See* pp. ——–—— of 197 U.S.App.D.C., at 471–472 of 607 F.2d *infra.*

**58.** Brief of FCC at 28.

**59.** *Id.* at 29.

**60.** 48 F.C.C.2d at 19.

serted that its researchers had examined (1) videotapes of *all* Evening News broadcasts in 1972; (2) transcripts of twenty-three CBS News Specials and fourteen "60 Minutes" programs broadcast in 1972; (3) indices and abstracts of all Evening News broadcasts in 1973; (4) scripts of all Evening News broadcasts in 1975; (5) recordings of all CBS–TV News programs in a randomly chosen two-week period in 1975; (6) scripts of all CBS–TV News programs (except "Face the Nation") broadcast in 1976; and (7) recordings of all CBS–TV News programs broadcast in May 1976. On the basis of these assertions, ASCEF's researchers were plainly shown to be "regular viewers" who "routinely . . . watche[d] the evening news and a significant portion of [CBS's] public affairs programs."

The requirement that a fairness complainant establish a *prima facie* case is, as we have said above, a commonsense requirement. Given the nature of the fairness doctrine, a complainant can legitimately be expected to make a show of having searched the broadcaster's overall programming for contrasting viewpoints. A complainant can reasonably be expected to search for such viewpoints, however, only where he sensibly would expect to find them. The Evening News is CBS's flagship news program, and has the largest audience of any television news broadcast. It dwarfs in its length, viewership, and importance the CBS Morning News, Midday News, and other subsidiary programs. The network's "News Specials" and "60 Minutes" are among its most popular news and public affairs broadcasts, and ASCEF examined all installments of these programs dealing with national security, defense, or foreign policy in 1972. If CBS did in fact present significant "opposing views" on national security in that year one would expect it to

have put them where ASCEF looked. To require that a complainant look much further afield at the *prima facie* stage of a fairness proceeding would be unreasonable.[61]

After the above discussion of the comprehensiveness of the study made by ASCEF, it is perhaps irrelevant to note a particular argument advanced in the majority opinion, *i.e.*, that the burden on CBS to respond to the complaint would be particularly heavy, that "CBS [w]ould have had to review all of its news programming relevant to national security over at least a year's time."[62] The majority's argument emphasizes how much more thorough was ASCEF's study in the instant case than probably any other complaint which the FCC has received under the fairness doctrine. ASCEF studied: (1) every Cronkite CBS Evening News broadcast in 1972; (2) transcripts of twenty-three CBS specials and fourteen "60 Minutes" programs the same year; (3) indices and abstracts of every Cronkite CBS Evening News broadcast in 1973; and (4) other programs in 1973, 1975, and 1976 as listed above. How many more CBS programs relevant to national security in 1972 could there have been? The CBS Morning News and the CBS Midday News were much briefer, and were in many parts repetitious of the flagship Cronkite Evening News. In the case at bar the complainant has produced virtually all of the evidence available and there is no burden left for the network to assume. This particular feature of the instant case should have been counted as a merit for the complainant, not made a subject of criticism, as the majority opinion does.

A related argument made by the majority is that the burden on all newscasters would be enormous in that spot decisions

---

**61.** A more stringent requirement, given the nature of ASCEF's study, would be particularly unreasonable in this case. Much to its credit, ASCEF tried to make its fairness presentation as accurate and scientific as possible, and to this end it desired to examine videotapes of the relevant broadcasts. ASCEF apparently decided to concentrate on the Evening News in part because that was the only CBS News program

for which videotapes were available in the Vanderbilt news archives. To require that ASCEF make a "viewpoint analysis" for all other CBS News programs during 1972 would thus require it to do virtually the impossible.

**62.** Maj. op. at —— of 197 U.S.App.D.C., at 451 of 607 F.2d.

would have to be made as to preserving a balance on any controversial issue of public importance.[63] Of course, the balance called for by the fairness doctrine is over a period of time, and is a rough and not mathematical balance. More importantly, this particular argument of the majority demonstrates that the previous principal argument, that the issue should have been defined as a much more limited category, is entirely spurious. If we take any of the topics which the majority claims could have been defined,[64] the network would labor under the *same purported handicap* in daily news coverage.[65]

Thus, when we look at the issues which the majority urges could have been used (*e.g.,* NATO or detente), we see that, irrespective of the "issue" as redefined (and presumably to which the FCC would have had no valid objection), all are issues which have been covered for many years in the past and no doubt will be for years to come, and in connection with which the same burden would be thrust upon the news broadcaster. If this burden is too much for the television licensee to carry, then what the majority is saying is that the fairness doctrine itself is too much of a burden for the television licensee, and that there is *no way* under the fairness doctrine by which a broadcaster can be held to account on a really large and important issue, *e.g.,* U.S.– Soviet relations. If this is the ultimate majority opinion holding, *such a holding should be recognized as such and reconsidered at the very highest level.*

For these reasons, we conclude that ASCEF submitted sufficient evidence of imbalance in CBS's overall programming on "the issue" during the period surveyed to make out a *prima facie* case. The Commis-

sion's contrary conclusion, in view of its own procedural standards, was an abuse of discretion.

D. *Timeliness of the Complaint.*

In its opinion the FCC suggested that although ASCEF had submitted "a voluminous, in-depth analysis of the opinions expressed" in a variety of CBS News programs in 1972–73, 1975, and 1976, its study still "[fell] short of examining the overall programming of the network" because it "made no allegations as to the content of almost two years of the network's programming—a period during which numerous election campaigns were underway" and during which "national security issues might well have been topics for discussion." [66] The suggestion, we think, is frivolous. The *Fairness Report* requires only that a complainant establish his status as a "regular viewer." It does not suggest that a complainant, to be a regular viewer, must monitor the station for five consecutive years. The FCC in the past has found complainants to be "regular viewers" on the basis of their assertion that "they monitored the station 'for many hours, over many weeks.' " [67] ASCEF easily surpassed that record here.

Both the FCC [68] and CBS, finally, suggest that ASCEF is to be faulted for "wait[ing] more than three years" from the time the 1972 programs were broadcast—the programs that formed the core of its study— before filing its complaint.[69] ASCEF finished its report in October 1974 and immediately sent the results to CBS. Six months later CBS delivered its definitive response. ASCEF at once undertook to update its study (May 1975), and updated it again just before filing its complaint (May 1976). To

---

63. Maj. op. at —— of 197 U.S.App.D.C., at 451 of 607 F.2d.

64. Maj. op. at —— and —— –—— of 197 U.S.App.D.C., at 450 and 448–449 of 607 F.2d.

65. Moreover, since ASCEF separately addressed various national security issues which the Commission concedes are suitably narrow, *see* p. —— of 197 U.S.App.D.C., p. 448 of 607 F.2d *supra,* enforcement of the fairness doctrine in this case would be accompanied by

only the ordinary, and presumably permissible, degree of burden on the broadcaster.

66. 63 F.C.C.2d at 369.

67. *Peter C. Herbst,* 48 F.C.C.2d 614, 614–15 (1974).

68. Brief of FCC at 3.

69. Brief of CBS at 38.

suggest that ASCEF can be scored for dilatoriness on this record is unsupportable. Obviously, the complainant could have sent its study to the Commission in 1974 without giving CBS a chance to reply. That, however, would have violated the Commission's published rules of fairness doctrine procedure.[70] Alternatively, the complainant could have omitted its recheck for the years 1975 and 1976. In that event, however, the complainant might well have anticipated a rejoinder that its findings were stale or insufficiently thorough. Having first complied with the Commission rule and then made its findings thorough and up-to-date, the complainant is now faced with the charge that its complaint is untimely. This is "Kafkaesque"[71] bureaucracy in the ultimate.

## III. CONCLUSION

In effect, the obligation of the television licensee is the other side of the coin from the obligation of a court. The most essential part of due process for centuries has been recognized by Anglo-American jurists to be *audi alteram partem* —"hear the other side." A licensee's obligation is to permit the other side to be heard by the American public. "The essential basis for any fairness doctrine, no matter with what specificity the standards are defined, is that *the American public must not be left uninformed.*"[72] We recognize in the courts that no justice is done if both sides are not heard; occasionally a court may reach a right result without hearing both sides, but we insist on the procedural due process of hearing both sides to validate the eventual judgment.

In regard to the exercise of free speech on the airways, the only protection under the first amendment which those citizens not involved in the broadcast industry have is the protection of the fairness doctrine. Since television licenses cannot be granted to all, there must be a rough balance in the points of view presented over the airways.[73]

---

**70.** *See Broadcast Procedure Manual*, 49 F.C.C.2d at 5, 39 Fed. Reg. at 32290:

> If you believe that a broadcaster (station or network) is not meeting its obligation to the public under the fairness doctrine, you should complain first to the broadcaster. If you believe that a point of view is not being presented and wish to act as spokesman for that point of view, you should first notify the broadcaster. Barring unusual circumstances, complaints should not be made to the Commission without affording the broadcaster an opportunity to rectify the situation, comply with your request, or explain its position.

**71.** *Cf.* Justice Rehnquist's opinion for a unanimous Court in *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 557, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

**72.** *Green v. FCC*, 144 U.S.App.D.C. 353, 359, 447 F.2d 323, 329 (1971) (emphasis original).

**73.** The obligation of the broadcast licensee under the fairness doctrine, and the use of the airwaves of which CBS is accused by the petitioners here, finds echo in the words of Alexander Solzhenitsyn in his now famous speech at the Harvard Commencement of 1978:

> The defense of individual rights has reached such extremes as to make society as a whole defenseless against certain individuals. It is time, in the West, to defend not so much human rights as human obligations.

> The press too, of course, enjoys the widest freedom (I shall be using the word "press" to include all media). But what sort of use does it make of this freedom?
> Here, again, the main concern is not to infringe the letter of the law. There is no moral responsibility for deformation or disproportion. What sort of responsibility does a journalist have to his readers, or to history? If he has misled public opinion or the government by inaccurate information or wrong conclusions, do we know of any cases of public recognition and rectification of such mistakes by the same journalist or the same newspaper? No, it hardly ever happens, because it would damage sales. A nation may be the victim of such a mistake, but the journalist always gets away with it.

> Such as it is, however, the press has become the greatest power within the Western countries, more powerful than the legislative, the executive, and the judiciary. One would then like to ask: By what law has it been elected and to whom is it responsible? In the Communist East, a journalist is frankly appointed as a state official. But who has granted Western journalists their power, for how long a time, and with what prerogatives?

> Enormous freedom exists for the press, but not for the readership, because newspapers mostly give emphasis to those opinions that

The licensee is the custodian for service to the public. Neither the licensee, nor the FCC, nor any member of the public can be the arbiter of the truth of what is broadcast. But the licensee, and then the FCC if the licensee does not perform, is the arbiter and enforcer of preserving a rough balance in the discussion of controversial issues of public importance over the facilities of each licensee.

As we stressed at the outset, so we emphasize in conclusion, that we express no views on the merits of ASCEF's complaint. Whatever flaws the study on which the complaint was based may ultimately be shown to have, the FCC did not demonstrate them in its opinion ruling on whether the complainant had made a *prima facie* case. Indeed, by the very nature of the issue and the purported exhaustive documentation, it would have been virtually impossible to have done so. We say only that, as a procedural matter, ASCEF specified "an issue" and presented sufficient evidence of imbalance in the network's overall programming on that issue to meet the threshold requirements of a *prima facie* case concerning the issue of national security. Since we anticipate the Commission could hardly find the issue of national security not to be "controversial" and "of public importance," as the majority seems to agree, it should, in accordance with its own procedures, have made inquiry of CBS.[74]

We therefore respectfully dissent.

## APPENDIX A

### EXAMPLES OF NATIONAL SECURITY VIEWPOINTS: 1972 [1]

*The following list of eight national security issues illustrates the differences between the A, B, and C viewpoints. This was used as a guide in coding the CBS Evening News items.*

| Issues | Viewpoint A | Viewpoint B | Viewpoint C |
|---|---|---|---|
| 1. Desirable Military Balance | U.S. should be superior to USSR | Parity between U.S. and USSR | Not necessary for U.S. to match Soviet military power |
| 2. Actual Military Balance | USSR is ahead of U.S. | USSR and U.S. are about equal | U.S. is ahead of USSR |
| 3. SALT: ABM and Missile Freeze | Favors Soviet Union at expense of U.S. | Preserves strategic parity and enhances international peace | Laudable, but not sufficiently comprehensive |
| 4. U.S. Defense Budget | Should be substantially increased | Should retain present level | Should be substantially decreased |
| 5. Soviet and Chinese Objectives | USSR and PRC still intend to expand their influence by any available means | USSR and PRC have mellowed and are less expansionist | USSR and PRC intentions are largely peaceful |

do not openly contradict their own and the general trend.

Without any censorship in the West, fashionable trends of thought are carefully separated from those that are not fashionable. Nothing is forbidden, but what is not fashionable will hardly ever find its way into periodicals or books or be heard in colleges. *Harvard Magazine,* July-August 1978, at 22–23.

74. Compare the FCC's obligation to make inquiry of a station prior to renewal of its license, as set forth in our recent *en banc* decision in *Bilingual Bicultural Coalition on Mass Media v. FCC,* 193 U.S.App.D.C. 236, 595 F.2d 621 (1978). The remedy requested by ASCEF before the Commission probably has been outdated by the passage of time. *See* maj. op. at —— n.11 of 197 U.S.App.D.C., at 443 n.11 of 607 F.2d. Whether *opportunity* for the presenta-

tion of views on the topics listed is still desired or not, obviously the question of whether CBS violated the fairness doctrine still should be determined. A violation of the fairness doctrine by CBS is of direct relevance to its competence and trustworthiness as a licensee in the public interest of five television stations and several radio stations. If inquiry is made by the Commission, as this dissenting opinion holds that it should be, and if a violation of the fairness doctrine is found by the Commission (a matter on which this dissenting opinion expresses no view), then this would be a matter of serious evaluation at the time CBS's licenses come up for renewal. An adjudged violation of the fairness doctrine, if any occurred, would have to be taken into consideration with other factors bearing on the public service demonstrated by the licensee during the license period.

| Issues | Viewpoint A | Viewpoint B | Viewpoint C |
|---|---|---|---|
| 6. U.S. Allies | U.S. should give greater support to its allies | Allies should receive modest U.S. support | U.S. support to allies should be substantially cut |
| a. NATO | U.S. should maintain its force level in Europe | U.S. should withdraw forces as Soviets withdraw | U.S. should unilaterally withdraw forces |
| b. Vietnam War (1972) | U.S. should take war to enemy | U.S. should withdraw as Saigon takes responsibility for fighting | U.S. should withdraw as fast as possible regardless of effect on South Vietnam |
| c. South Vietnam Government | Moderately responsive, enjoys fairly broad popular support; merits strong U.S. assistance | Moderately responsive, enjoys fairly broad popular support; declining U.S. aid sufficient | Corrupt, repressive, dictatorial, unworthy of U.S. aid |
| 7. North Vietnam Government | Dictatorial, repressive regime seeking to conquer S. Vietnam; breaks international commitments | Dictatorial, repressive regime seeking to conquer S. Vietnam; may keep international commitments | Authoritarian, fighting just war to unite Vietnamese people; will keep international commitments |
| 8. China (Peking) | | | |
| a. Government | Totalitarian, repressive, expansionist | Totalitarian, mellowing slightly | Disciplined, socially progressive |
| b. President's Trip | Legitimatized Red China and weakened Taiwan | Reduced tensions and encouraged detente | U.S. should have recognized Peking long before |

[1] Reproduced from E. Lefever, TV and National Defense 79 (1974), S.J.A. at 79.

## APPENDIX B

The following persons were members of the Independent Review Panel: Ambassador Willard L. Beaulac, consultant; Robert A. Gessert, Principal Scientist, General Research Corporation/Research Analysis Corporation; Whittle Johnston, Woodrow Wilson Department of Government and Foreign Affairs, University of Virginia; Charles Burton Marshall, Paul H. Nitze, Professor of International Politics, and Research Associate at the Washington Center of Foreign Policy Research, School of Advanced International Studies; Eugene H. Methvin, Johns Hopkins University, Senior Editor, Reader's Digest, Washington Bureau; Paul Ramsey, Harrington Spear Paine Professor of Religion, Princeton University; Riordan Roett, Director of Latin American Studies and Associate Professor of Political Science, School of Advanced International Studies, Johns Hopkins University; Dr. William Schneider, Consultant, Hudson Institute.

The following persons were members of the Board of Directors of ASCEF at the time of the study; Karl R. Bendetsen, Retired Chairman, Champion International; Gus A. Buder, Jr., Attorney; Ambassador Elbridge Durbrow, Director, Freedom Studies Center, ASCEF; Rosemary Edmiston; Harold F. Falk, Chairman, Executive Committee, Falk Corporation; Sol Feinstone, President, S & R Foundation; John M. Fisher, President and Chief Executive Officer, ASCEF; Patrick J. Frawley, Jr., President, Frawley Enterprises; Robert W. Galvin, Chairman, Motorola, Inc.; Ellen Garwood; the Honorable Mills E. Godwin, Jr., Governor of Virginia; Lady Malcolm Douglas-Hamilton, President, Committee to Unite America, Inc.; Marjorie H. Hankins, Member, Executive Committee, Missouri Council on National Security; Francis A. Harrington; Michael J. Harvey, Jr., President, Michael J. Harvey, Jr. Foundation; George R. Hearst, Jr., Publisher, Los Angeles Herald-Examiner; Walter H. Judd, M.D.; James S. Kemper, Jr., President, Kemper Insurance Companies; Charles H. G. Kimball, Partner, Ashcraft and Ashcraft; Ollie W. Langhorst, Executive Secretary-Treasurer, Carpenters' District Council of St. Louis; Ambassador Clare Boothe Luce; Lawrence J. Meisel, Chairman of the Executive Committee, Missouri Council on National Security; Dr. Arthur G. B. Metcalf, Chairman of the Board and President, Electronics Corporation of America; Ellen

Ogle; Dr. Arthur L. Peterson, Chairman, Department of Politics and Government, Ohio Wesleyan University; Henry Regnery, Chairman, Henry Regnery Company; Henry Salvatori, President, Grant Oil Tool Company; Gerald J. Schipper, M.D.; John G. Sevcik, General Manager, McCormick Place; D. French Slaughter, Jr., Partner, Button, Slaughter, Yeaman & Morton; Colonel John Slezak, Chairman, Kable Printing Company; Dan A. Sullivan, Retired Conference Chairman, ASCEF; Francis J. Vignola, President, Vignola and Associates, Ltd.; William H. Weldon, Publisher, News Tribune Company, Inc.; Dr. Benjamin C. Willis, Former Superintendent of Schools, Chicago, Illinois; John R. Woods, Vice President, E. F. Hutton and Company, Inc.; James O. Wright, Chairman of the Board and President, Badger Meter Manufacturing Company.

## APPENDIX C

*The materials that follow, excerpted from TV and National Defense: An Analysis of CBS News, 1972–1973,[1] are illustrative of the methodology, data, and conclusions of the study on which ASCEF relied in making out a prima facie violation of the fairness doctrine by CBS.*

[Chapter 4. Viewpoint Analysis.]

. . . . .

The Fairness Doctrine of the FCC requires TV stations and networks to provide a "reasonable opportunity for the presentation of conflicting views on issues of public importance" to "promote diverse and robust discussion." Did CBS Evening News in 1972 provide "a reasonable opportunity" for its vast audience to hear "conflicting views" on national security problems? That is the question addressed in this chapter.

We sought to answer this question by *content analysis*, which has been described by Dr. Charles Winick as "an established technique" and a "powerful tool" for the "systematic description of communication content." He adds: "Even though it relies on judgments, content analysis can be scien-

tific, if it is objective, systematic, and quantitative." Dr. Winick in 1971 prepared a critical report commissioned by CBS News on *The News Twisters* by Edith Efron.

In our content analysis of CBS Evening News we have made every effort to be "objective, systematic, and quantitative." At the same time, we recognize, as does Dr. Winick, such analysis relies on judgment. After grappling with the transcripts for several months, we developed a method we call *viewpoint analysis*, described in detail below, which may be a pioneering effort in the evaluation of communication content. We are fully aware that viewpoints are subtly transmitted by the communicator and subjectively received by the citizen-viewer, but we believe we have avoided the pitfall of subjectivity.

## Four Research Phases

As far as we are aware, no one before had attempted a detailed examination of the viewpoints presented in a full year of network evening news. This first effort necessarily involved a certain amount of trial and error. We frequently had to correct and refine early assumptions, terms of reference, and techniques. Gradually, we replaced doubtful and subjective methods with more certain techniques that relied less on personal judgment. While perfecting our viewpoint analysis, we introduced and developed other methods of content analysis, the results of which are reported in Chapters 2 and 3. The 14 major research steps of the viewpoint analysis fell under four partially overlapping phases:

## Phase 1: Initial Terms of Reference

1. We defined national security very broadly to include all broadcast material that fell under these nine subjects: 1) U.S. military posture, 2) U.S. national strength, 3) U.S. internal security, 4) USSR: military, 5) USSR: non-military, 6) China: military, 7) China: non-military, 8) Southeast Asia, and 9) other foreign relations.

1. E. Lefever, TV and National Defense (1974) (footnotes omitted).

( 2. We consulted the *Television News Index and Abstracts* of the Vanderbilt Television News Archive and rented video tapes of all evening news items carried by ABC, CBS, and NBC bearing on any of the nine subjects. (After we decided to limit the study to CBS, we returned the ABC and NBC video tapes.)

3. The Institute for American Strategy staff transcribed all the relevant CBS Evening News items for 1972. The resulting 1,396 transcripts became the original data base for the viewpoint analysis. A brief description of the audio-visual background was attached to each transcript.

4. A *viewpoint coding* system was devised to identify the opinion or perspective of all broadcast material on national security, using the actual position of the U.S. Government as the point of reference. In brief, the three viewpoints were: *Viewpoint A*, the threat to U.S. national security is greater than that on which present policy is based or we ought *to do more* to deal with the threat; *Viewpoint B*, the threat is approximately the same as that on which present policies are based and government efforts are generally appropriate; *Viewpoint C*, the threat to U.S. national security is less than that on which present policy is based or the government ought *to do less* in response to the lesser threat. If the national security item presented no viewpoint, it was designated as D. The three viewpoints are elaborated in the next section of this chapter.

## Phase 2: Preliminary Analysis

5. A questionnaire for evaluating each CBS News transcript was developed, calling for detailed responses from one of a group of academic analysts formed for this purpose. (The transcript analysts and other outside researchers are listed in the acknowledgements.) The analyst was required to code all viewpoint passages as A, B, or C, to indicate the intensity of the view presented, and to identify the "tactics" used by the newsman. He was required to prepare a narrative justification for all his judgments. He was also asked to note recurring *themes* in the news items.

6. After the transcript was returned from the *first reader*, it was reviewed by a *second reader*. If there was serious disagreement over the coding in a particular transcript, it was often returned to the first reader. In all cases, there was a *final reader* whose task was to assure a reasonable degree of consistency in the application of the viewpoint definitions. All 1,396 news items were subjected to this process.

7. The last steps in Phase 2 was the counting and tabulation of all viewpoint and D material by *news item* (as defined by Vanderbilt), by *idea unit* (coherent idea or thought), by *sentences* and by *words*. The tabulation was never fully completed because the reappraisal described in Phase 3 was already underway.

## Phase 3: Refining Terms of Reference

While performing the seven steps above, we ran into persistent coding problems rooted in our broad definition of national security, the difficulty of ascribing a viewpoint to a description of events, and the varying perceptions of different analysts. As a result, the following steps were taken, some of them concurrently:

8. An eight-member independent review panel met at the Institute for American Strategy, April 12–14, 1974, to evaluate all aspects of the project to date. (The members of the panel are identified in Appendix D.) They commented on three draft chapters of the report. More importantly, they each independently reviewed a representative selection of previously coded transcripts, indicating their concurrence or dissent. They discussed with the staff these coding problems, the viewpoint definitions, and the problem of news items which seemed peripheral to national security. The panel confirmed some changes already underway and suggested further refinements in method, all reflected in subsequent steps.

9. The broad and somewhat diffuse definition of national security was replaced by a more precise one bearing more directly on

U.S. defense and foreign policy. The following four topics replaced the nine noted in the first phase: 1) U.S. military and foreign affairs (including the U.S.–USSR military balance), 2) Soviet military and foreign policy, 3) China's military and foreign policy, and 4) Vietnam affairs.

10. The definitions of the three viewpoints were further clarified and sharpened. The D category was eliminated because it contained many irrelevant news items.

11. The single most perplexing coding problem was solved by a decision to code only directly presented viewpoints, rather than attempt to identify hidden or indirect viewpoints in reports of events. In the early months, we attempted to identify viewpoints in the reporting of events, such as battlefield reports from Vietnam, but we soon discovered that different analysts came to different conclusions. To eliminate these largely subjective judgments, we limited viewpoint coding strictly to explicitly expressed opinions reported on CBS Evening News or voiced directly by CBS correspondents. This decision had the effect of significantly reducing the number of news items finally coded. Virtually all of the numerous casualty and battlefield reports in Vietnam, for example, were eliminated. Out of the original 1,396 news items, only 274 survived this rigorous screening. This left an average of more than one item for each Evening News broadcast in 1972, quite adequate for our analysis.

12. We decided that no coding judgments were to be based on the visual or audio background or on the voice inflection or facial expression of the CBS commentator or any other person. We recognize that these are important audience impact factors, but we concluded that their interpretation was too subjective to be used. In the final analysis, only the words were evaluated.

Phase 4: Final Analysis

13. Using these refined terms of reference, definitions, and techniques, a team consisting of a senior independent analyst, a senior Institute staff member, and the author did the final coding of the 274 news items carrying explicit viewpoints, modifying the earlier coding when necessary.

14. The results of the final viewpoint coding were tabulated and are presented by sentences and by words.

We are confident that any other group of objective scholars, using our viewpoint definitions, would come to essentially the same conclusions. The reader is invited to check our method and judgments by referring to the coded news items for June 1972 reproduced later in this chapter.

The Three National Security Viewpoints

A viewpoint is a position, opinion or attitude on any public issue. The most common method of viewpoint analysis employs three categories: *for, against,* and *neutral.* This is the device normally used by opinion analysts. It was also used by Edith Efron in *The News Twisters.* This method lends itself particularly well to an examination of broadcast or published material in an election campaign.

In the more complex area of national security issues, however, we concluded that the *for-against* approach was not adequate. People are not for or against national security. The vast majority of American citizens, except for a tiny fraction of pacifists, support national defense and military spending. The real questions are *how much* to spend for what kinds of programs. Should we spend the same amount we are now spending, significantly less, or significantly more? The question of *how much* for national defense is closely related to the perception of the threat.

This natural breakdown—doing more, doing the same, or doing less—reflects the options confronting the U.S. Government. After we had adopted this three-option approach we learned that it bore considerable similarity to a method used in the first annual analysis of the United States Budget by the Brookings Institution. The Brookings authors in 1970 developed the concept of alternative *low, medium,* and *high* defense budgets for both strategic and general purpose forces. The *medium budg-*

*et* corresponded approximately to what the President had requested for fiscal year 1971, which was $72.3 billion. The *low budget*, based on a different assessment of the external threat and of America's responsibility in the world, came out at $48 billion, while the *high budget*, which assumed a greater threat and greater U.S. responsibilities, came to $77 billion. The Brookings study applied the three-option device for budget analysis to all domestic and foreign policy programs and used it with adaptations in the four subsequent budget studies.

In general, *Viewpoint A* holds that the threat to U.S. security is more serious than perceived by the government or that the United States ought to *increase* its national security efforts; *Viewpoint B* holds that present government threat perception is essentially correct or U.S. military and foreign policy efforts are adequate, and *Viewpoint C* holds that the threat to U.S. security is less serious than perceived by the government or that U.S. national security efforts should be *decreased*. These three perspectives can be better understood by consulting the chart on the following page which provides specific examples of the three viewpoints on eight major national security issues.

Millions of American citizens can be found who express viewpoints A, B, or C on any of the issues defined in the chart or other national security questions. This is also true of groups, organizations, and periodicals. While few persons or groups always take the A view or the C view, *there is considerable consistency in an individual or organizational perspective.*

· · · · ·

Example of Viewpoint Coding: June, 1972

To show the reader how viewpoint coding was done, we are reproducing below 40 sentences on a variety of topics exactly as they were broadcast during June 1972. In that month there were 59 sentences that carried explicit opinions on national security issues, but simply to shorten the example we eliminated the 19 sentences that happen to fall on June 15. In each case the source

of the passage is indicated along with the viewpoint coding we gave to it. In none of these cases did a CBS News correspondent express his own view; in this and other respects the sample is not typical.

June 1: SALT Agreement Limiting ABM Sites

*Roger Mudd* (CBS): "The already heated debate on the Moscow ABM Treaty has erupted on the Senate floor with Henry Jackson promising to lead a fight to shut down the two ABM sites in this country because he said the treaty made them useless. Jackson said the treaty negotiations were a comic opera of champagne sipping and frantic press briefings." (Viewpoint A)

June 2: SALT Agreements on ICBMs

*Senator Scott*: "Therefore, the best thing to do is to get an agreement whereby they [the Soviets] stop on the basis of what they're already building, instead of letting them double it. And there's every indication that's what they would otherwise have done." (Viewpoint B)

June 5: U.S. Defense Budget

*Defense Secretary Laird*: "I would say that the thing to do if you go the $30 billion route is to direct the Department of Defense to spend at least a billion dollars in white flags so that it can run them up all over, because it means surrender." (Viewpoint B)

*Senator Proxmire*: "Oh, now come on. The proposal that he [McGovern] has, and I don't support it, I've indicated that I think it ought to be higher than that, substantially higher. I don't know how you can call that a white flag proposal when it does provide that we would have, continue to have, superiority in many areas." (Viewpoint C)

*Secretary Laird*: "The point I would like to make, and why I call reductions such as those white flag reductions—and they are white flag reductions—because they are unilateral in nature." (Viewpoint B)

*Senator Proxmire*: "Now Mr. Secretary, you kept talking about the white flag reduction. If white flag means anything to me, it means surrender. It means

. . . [interrupted by Laird] Now just a minute, Mr. Secretary, you've been . . . I haven't interrupted you. I let you talk. Let me just talk for a minute or so and point out, number one, that it is not a white flag or a surrender action on the part of Senator McGovern when he proposes . . . ." (Viewpoint C)

*Secretary Laird*: "I say that any reduction on a unilateral basis before we go into negotiations on these very delicate subjects, that a unilateral disarmament action is a surrender action." (Viewpoint B)

*Bob Schieffer* (CBS): "To underscore his opposition to new defense cuts, Laird told a House Committee later in the day that he'll be forced to ask for a three to five billion dollar boost in the new budget if the North Vietnamese offensive continues through the end of the year. That would mean obligating more than $88 billion for defense next year." (Viewpoint B)

. . . . .

## Distribution of Evening News Viewpoints

The bulk of the 25.6 hours on national defense and foreign policy matters broadcast by CBS Evening News in 1972 was devoted to the reporting of events, notably the war in Vietnam. Only a small portion was given to reporting opinion about events and a still smaller portion was given to direct CBS views. In the final viewpoint analysis, 274 different news items were examined and coded. This included 725 separately coded passages within news items. (A passage is an unbroken statement of one or more sentences containing *one* viewpoint from *one* source.) The number of passages per month in 1972 follow:

| | | | |
|---|---|---|---|
| January | 58 | July | 65 |
| February | 62 | August | 73 |
| March | 15 | September | 48 |
| April | 74 | October | 72 |
| May | 71 | November | 19 |
| June | 61 | December | 107 |

In these 725 coded passages there were a total of 2,235 sentences and 44,789 words. Both sentences and words were translated into percentages for each of the three viewpoints and four subjects. The difference between the word count and the sentence

count turned out to be approximately 0.5 percent. This is not significant, so all subsequent data, except for Table 4–1, below, are based on the sentence count. The table summarizes the viewpoint distribution for all four national security subjects for 1972:

Table 4-1

Viewpoint Distribution: Summary

| | Sentences | | Words | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| Viewpoint A | 79 | 3.54 | 1,672 | 3.73 |
| Viewpoint B | 774 | 34.63 | 15,690 | 35.03 |
| Viewpoint C | 1,382 | 61.83 | 27,427 | 61.24 |
| Totals | 2,235 | 100.00 | 44,789 | 100.00 |

The above table shows that CBS Evening News gave preponderant (over 61 percent) attention to Viewpoint C and scant (under 4 percent) to Viewpoint A. Most of this disparity between C and A is attributable to the high proportion of Vietnam sentences (1,719 out of 2,235) and the high proportion (69.87 percent) of C material in these Vietnam sentences. The A, B, C distribution is indicated in the following table, first of all four subjects (United States, Soviet Union, China, and Vietnam), and then for the three subjects, less Vietnam.

Table 4-2

Viewpoint Distribution By Sentences

FOUR SUBJECTS

Viewpoint A ▆ (79)

Viewpoint B ▆▆▆▆▆▆▆▆▆▆▆▆▆ (774)

Viewpoint C ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (1,382)

THREE SUBJECTS (Excluding Vietnam)

Viewpoint A ▆ (54)

Viewpoint B ▆▆▆▆▆▆ (281)

Viewpoint C ▆▆▆▆ (181)

Taking all four subjects together, CBS News gave seventeen times as much attention to views advocating that the U.S. Government do substantially less in defense and national security than to views advocating that the government do more.

*When the Vietnam material is excluded, Viewpoint C sentences outnumber A sentences by more than three to one.* We will return to this point at the conclusion of this chapter.

It may be argued that since Vietnam comprised three-quarters of the viewpoint

sentences which were strongly biased in the C direction, Viewpoint material should be treated separately and that Vietnam statistics should not be combined with those of the three other topics. Our response is twofold. *First,* Vietnam is treated separately. Chapter 5 is devoted entirely to it.

*Second,* we believe the Vietnam viewpoint statistics should be included with the data on the other three topics, but that the number of sentences and percentage for each topic should be clearly indicated. There are three reasons for including Vietnam in the general analysis of this chapter:

1. CBS–TV Evening News in 1972 considered Vietnam by far the most important security issue, devoting more than twice as much time to it as to all other military and foreign policy subjects combined.

2. Vietnam continues as an issue of national concern. In 1973 after the truce had been signed, CBS Evening News gave almost as much time to Vietnam as to all other national security issues combined. And throughout 1974, Vietnam has continued as a major issue of interest to the American people, their government, and the communications media.

3. Perhaps most important, Vietnam was, and to a substantial extent still is, a controversial issue, one on which there are diverse and deeply held positions. It is precisely this kind of controversial question to which the Fairness Doctrine is addressed. It is precisely the kind of issue by which the performance of CBS News or any other network should be evaluated.

. . . . .

Did CBS Advocate Viewpoint C?

The evidence presented in this chapter thus far suggests that CBS Evening News in 1972 gave reasonably fair coverage to Viewpoint B in three of four national security subjects, Vietnam being the exception. The bias became evident in the uneven coverage accorded the two opposing views, except in dealing with Soviet policy toward the Middle East. The viewpoint bias was pronounced in each of the other three subjects where C significantly outstripped A by

these ratios: United States, 3.7 to 1; China, 6.25 to 1; and Vietnam, 48 to 1.

Does this mean that CBS Evening News was advocating Viewpoint C? Before answering this question, several things need to be said. It might be argued that in spite of the disproportionate emphasis on C material and the neglect of A material, the result was a reasonably accurate reflection of the available opinions of national spokesmen in 1972. This argument has little merit. There were, admittedly, a larger number of articulate members of Congress who called for reductions in defense spending than there were calling for an increase in military expenditures. But it is also true that there were and are many prominent Representatives and Senators who were quietly advocating stronger national defense measures. These quieter voices were often overlooked by the communications media, especially those media not hospitable to the views expressed. Furthermore, even if it could be demonstrated that there were more C views on Capitol Hill than A views, this would be no excuse for giving 16 times as much time to the advocates of C views.

It may also be argued that CBS News met the Fairness Doctrine requirement of balance because it gave a reasonable opportunity to the viewpoints espoused by the two principal candidates in the Presidential election. It is true that the B views of President Nixon, with the exception of those on Vietnam, and the C views of Senator McGovern on all topics were reasonably covered. But there were other views of significance that were largely ignored by CBS. All significant views on national defense should be debated, especially in an election year when a wide range of policy options should compete for consideration and support. It is only in such a wide-ranging debate that the electorate has some chance of assessing the positions of candidates or of influencing national policy.

A clue to the disproportionate emphasis of CBS News on Viewpoint C may be found by examining the two chief sources of Viewpoint A and C material—the public and CBS newsmen themselves—as noted in the following table:

**Table 4-5**

**Viewpoint Distribution by Source**

*This bar graph depicts by percentage and sentences the amount of CBS Evening News viewpoint material devoted to the four subjects by the source of the viewpoint.*

**Viewpoint A**

| | |
|---|---|
| Administration | 0.0% |
| CBS | 0.63% (14 Sentences) |
| Other | 2.91% (65 Sentences) |

**Viewpoint B**

| | |
|---|---|
| Administration | 19.38% (433) |
| CBS | 2.32% (52 Sentences) |
| Other | 12.93% (289 Sentences) |

**Viewpoint C**

| | |
|---|---|
| Administration | 0.80% (18 sentences) * |
| CBS | 15.66% (350 Sentences) |
| Other | 45.37% (1,014) |

* Occasionally U.S. Government officials speaking unofficially expressed C views.

Table 4–5 presents the three sources of all viewpoint sentences—the Administration (the primary source of B views), CBS newsmen, and all other sources. By CBS views we refer to direct opinion on current issues. expressed by any CBS newsman, not just the editorial commentary of Eric Sevareid. Most, if not all, CBS newsmen at one time or another have expressed their own opinions directly on the air. Of the 2,235 viewpoint sentences coded, 416 originated from CBS newsmen. As noted in Table 4–5, the great preponderance of the 416 CBS viewpoint sentences were coded C, as follows:

**Directly Expressed Viewpoints By CBS Newsmen: 1972**

| | |
|---|---|
| Viewpoint A | 3.37% (14 Sentences) |
| Viewpoint B | 12.50% (52 Sentences) |
| Viewpoint C | 84.13% (350 Sentences) |

This chart demonstrated that when CBS newsmen chose to express an explicit opinion they chose C views 25 times more frequently than A views. One can infer from this that the reporters on CBS Evening News, if not CBS News as a corporate entity, preferred the C perspective and that they were, in fact, advocating this view directly to their vast audience.

To the argument that the CBS newsmen may not have been aware that they were giving their own opinions, let them read what they have said. To the argument that they may have been giving their views, but this does not amount to advocacy, we must point out that when CBS Evening News selected views from the larger public for broadcast, the same disproportion between A and C is evident, though it is slightly less pronounced. In direct CBS advocacy the ratio was 25 to 1 in favor of C over A, and in indirect advocacy by presenting viewpoints from other sources the ratio was 15 to 1. In sum, CBS News reinforced its direct and one-sided expression of national security views by selecting a spectrum of opinion from the public which was only slightly less one-sided.

The Neglect of Viewpoint A

It is wholly permissible under the Fairness Doctrine for CBS Evening News to advocate Viewpoint C or any other position, providing that it gives a "reasonable opportunity" for the expression of conflicting views. This CBS Evening News did not do in 1972.

It did not provide a "reasonable opportunity" for Viewpoint A, though there were many available expressions of this perspective from politicians, military experts, scholars, editors, business executives, and leaders of civic, religious, and professional organizations, as noted earlier in this chapter. Perhaps these views were not as readily available as contrary views, in part because the Presidential campaign tended to limit the parameters of debate to viewpoints B and C. But CBS News reinforced this narrowing of the issues by focusing almost exclusively on the Administration position and the McGovern attack, to the virtual exclusion of alternative views.

CBS Evening News failed to exercise its "affirmative duty" under the Fairness Doctrine actively to seek out and present A views. The NAB *Television Code* says the broadcaster shall "seek out and develop with accountable individuals, groups and organizations, programs" that will "give fair representation to opposing sides." This failure to locate and report less accessible, but equally valid news, is fully documented in the *proper name analysis* in Chapter 5.

CBS Evening News failed to give adequate coverage to A views either in a quantitative or qualitative sense. In all four national security subjects combined, the ratio of C to A views is 17 to 1, and when Vietnam is excluded, the ratio is 3 to 1. The quantitative case is clear.

But the qualitative case may be more significant. When the sprinkling of A views are examined, two facts become apparent. *First*, many A sentences were not as clearly expressed as their C counterparts. In coding A passages, we frequently had to sense an A position in a relatively vague statement, such as Walter Cronkite's reminder that Chinese weapons took American lives, or his report of Soviet aid to Arab guerrillas. We never found an A statement advocating that the U.S. defense budget be increased by $5 to $10 billion, but there were several C positions advocating cuts of $10 to $30 billion. Further, a number of the A statements were defensive rather than affirmative. CBS references to Senator Jackson's criticisms of the SALT I agreements are examples.

*Second*, many of the A statements reported by CBS were on topics peripheral to the central military calculus between the Soviet Union and the United States. This was particularly true of the 16 A sentences identified under the Soviet Union, of which only two dealt with the strategic balance.

Because of the relatively vague or peripheral character of most of the few A viewpoints CBS permitted on the air, the citizen-viewer was poorly served. As far as we could determine, the attentive viewer throughout 1972 would never have heard a *clear-cut* statement to the effect that the Soviet Union was militarily superior to the United States, that the United States should be militarily superior to the Soviet Union, or that the combination of Moscow's military might and political designs constituted a growing threat to the United States and its allies, with the single possible exception of Governor George Wallace's July 7 general assertion that the United States should be "so strong that no nation on the face of the earth will want to do anything but talk with us."

The absence of these views was reinforced by the seriously deficient factual reporting by CBS Evening News of Soviet military developments and Soviet statements on the meaning of detente, noted in Chapter 3. The *theme analysis* in Chapter 2 also demonstrates that there was little substantial reporting on Soviet military developments, but a great many stories on the desirability of detente.

These CBS News deficiencies in presenting the multiple confrontation of the superpowers, as revealed by theme and viewpoint analysis, are magnified in the smaller theater of the Vietnam War. In neither case did the citizen-viewer receive from the CBS Evening News the facts or opinions essential to thoughtful debate on these vital issues.

[Chapter 6. Overall Evaluation of CBS News.]

### Requirements for Responsible Broadcasting

The standards we used to evaluate CBS–TV News are drawn from the FCC's Fairness Doctrine which, as demonstrated in Chapter 1, are substantially the same as the standards of the National Association of Broadcasters (NAB) *Television Code* and the Radio Television News Directors Association (RTNDA) *Code of Broadcast News Ethics.*

The Fairness Doctrine and the industry codes apply to news, news commentary, and documentaries, and are equally applicable to local TV stations and to the networks. The requirements of the Fairness Doctrine and the codes can be summarized in four essential points. The first relates primarily to "straight" reporting about events, and the remaining three to broadcasting of opinion and judgments about events. The direct quotations are from the industry codes:

1. The broadcaster has an obligation to provide *"accurate and comprehensive"* news in a context that gives it "meaning and perspective," according to the RTNDA code. The NAB *Television Code* says TV

"news reporting should be factual, fair, and without bias."

2. The broadcaster has a right to advocate his views on any controversial issue, but he has a corresponding *obligation to present all other major views* on that issue. He must provide a forum for meaningful and balanced debate on the public questions he addresses. The NAB code says: "Commentary and analysis should be clearly identified as such" and "opinion should be appropriately distinguished from news."

3. To achieve balance, the broadcaster must *identify, find,* and present all major views on the controversial issues he addresses. The NAB code says the "broadcaster should seek out . . . accountable individuals, groups and organizations" to present "controversial public issues" and give a "fair representation to all opposing sides of issues which materially affect the life or welfare of a substantial segment of the public."

4. When the broadcaster airs opposing opinions, he must provide *"a reasonable opportunity"* for each view. This means the opposing view must be presented when the issue is still current, and that the time given to it, the size and character of the audience, and the quality of presentation must be approximately the same. (See Chapter 1, page 7.)

Judged by these four standards, how well did CBS News measure up? Each requirement is considered in turn.

1. News Reporting Should Be Factual, Fair, Full, and Meaningful

. . . . .

The most seriously neglected area on CBS Evening News was that of Soviet military developments. A citizen-viewer who watched the 196 hours broadcast in 1972–73 would have learned almost nothing about the changing military balance between Washington and Moscow. During that entire two-year period, the program devoted a total of one minute explicitly to the comparative military situation. The viewer would have gained almost no knowledge of the growing Soviet military might in missiles, aircraft, and warships. He would not have learned that the USSR developed a 4,500-mile submarine missile, a new generation of massive missiles capable of destroying U.S. Minuteman missiles in their silos and of carrying multiple warheads, and a system capable of destroying U.S. reconnaissance satellites. He would not have learned that the USSR launched its first aircraft carrier and started building its second, was producing 5 to 9 nuclear missile submarines a year, and was producing a new supersonic strategic bomber, the Backfire, capable of delivering nuclear bombs to the United States. He would not have known that Soviet military expenditures ran about $90 billion a year, four times the figure announced by Moscow.

In covering President Nixon's February 1972 trip to Peking and subsequent reporting, CBS Evening News omitted ten significant stories on Chinese military developments and two on Peking's negative views of the United States. There were several brief references to Chinese nuclear weapons developments, but these tended to be drowned out by a cascade of largely positive reporting about China. The 1972 theme count on detente with China was 54 for and 3 skeptical.

A week before President Nixon's May 1972 trip to Moscow to sign the SALT I agreement on nuclear weapons, CBS broadcast a 60-minute special, *Where We Stand,* which included more hard information on the strategic balance than the 521 Evening News programs in 1972 and 1973 combined. It was the only such program in the two-year period. *Where We Stand* was strongly pro-detente, but it noted that the Soviet Union was moving rapidly to catch up with the United States economically, technically, and militarily. More important, however, the program failed to provide a number of the significant military facts conspicuously omitted from the Evening News. (See Chapter 3.)

If the citizen-viewer in 1972 and 1973 relied solely on CBS Evening News for understanding the vital issues of national

security he would have been poorly served. He would not have had the elementary facts to make sound judgments. The President's budget request for developing the B–1 bomber or the Trident submarine system would have made little sense to him because he would have heard nothing about the Soviet Backfire bomber or the significant advances in the Soviet nuclear-missile submarine fleet.

In short, CBS national security news was so spotty and lopsided that it failed to provide the essential facts for understanding U.S. defense and military issues, the Soviet definition of detente, or the forward surge in Soviet military might. Consequently, on the first requirement for responsible broadcasting, *we conclude that CBS Evening News was seriously deficient in presenting a fair, full, and meaningful picture of national security developments.*

.　　.　　.　　.　　.

Even the limited time allotted each issue was not wisely used. This was perhaps most striking in the coverage of U.S. military affairs in 1972 and 1973. Overwhelming attention was given to problems within and criticisms of the military, and relatively little attention to the basic mission of the Armed Services or their accomplishments. An analysis of how CBS Evening News presented 246 news items on military matters for the two years (Chapter 2, Tables 2–5 and 2–6) indicates that approximately two-thirds of the time was devoted to stories that cast the U.S. military in an unfavorable light:

CBS Presentation of U.S. Military Affairs

| | 1972 | 1973 |
| --- | --- | --- |
| Unfavorable | 62% | 69% |
| Neutral | 30% | 13% |
| Favorable | 8% | 18% |

The attentive listener who relied solely on CBS Evening News would have received a highly distorted view of the U.S. Armed Forces. He would have heard a great deal about a senseless, brutal, and unjust war in Vietnam, and virtually nothing about the heroism or humanity of American soldiers. He would have heard much about the demoralization, racial conflict, and drug abuse in the Army, Navy, and Air Force, but he would have heard almost nothing about their defense and deterrent missions. Frequently, he would have heard criticism of an enormous defense budget swollen by the selfish interests of a military-industrial complex and fed by corruption, design faults, and cost overruns.

Much of CBS Evening News reporting on military affairs was trivial, to the neglect of the significant. On March 19, 1973, for example, there was a 1:50 minute story about the disappearance of thousands of table utensils from Pentagon cafeterias, almost twice as much time as CBS devoted to stories on the direct U.S.–Soviet military calculus for the entire two-year-period.

In its watchdog role, the press should be constantly critical of an institution as powerful and influential as the military establishment and there is much in the military that deserves criticism. Granting this, the overwhelmingly negative portrayal of the military by CBS Evening News cannot be justified. It was not balanced by information which would enable the viewer to assess the significance of the criticism. Further, the relentless barrage of criticism of military practices and personnel tended to discredit the military establishment itself, making it difficult for the citizen to give serious attention to the threat appraisals, strategic judgments, and budget requests coming from the Defense Department.

## 2. Advocacy Should Be Balanced by Opposing Views

The Fairness Doctrine permits a broadcaster to advocate his own views on controversial issues, but it requires him to balance this by presenting all other major views. The evidence presented in the four preceding chapters demonstrates that CBS Evening News was an active advocate on several national security issues and that its advocacy was not adequately balanced by opposing views.

CBS Evening News advocated its views directly through the explicitly expressed opinions of its newsmen. This became clear by examining the source of the viewpoints

on the four principal subjects—United States, Soviet Union, China, and Vietnam. (See Appendix F and Table 4–5 in Chapter 4.) Of the 2,235 sentences expressing A, B, or C viewpoints, 416 or 18.61 percent came from CBS newsmen. Of the 416 CBS sentences, 350 expressed Viewpoint C, 52 Viewpoint B, and 14 Viewpoint A—a ratio of 25 to 1 of C over A. We conclude, therefore, that CBS Evening News was advocating Viewpoint C. This it had a right to do, but not without providing a reasonable opportunity for other important opinions. The preponderance of C views over A was true of all subjects except the Soviet Union . . .

The exception of the Soviet Union, as noted in Chapter 4, can be accounted for by CBS criticism of Soviet support of Arab guerrilla groups. CBS advocacy of the C view was overwhelming in its presentation of Vietnam issues; the ratio of C to A was 287 to 1.

. . . . .

3. Opposing Views Should be Actively Sought

The lopsided distribution of national security views in the 1972–73 CBS Evening News is ample evidence that CBS failed to seek out opposing opinions and perspectives. This was particularly true of A views, such as the following:

 a. The Soviet Union still has the objective of eventual world domination.

 b. That Soviet Union is militarily more powerful than the United States.

 c. The fast pace of Soviet strategic weapons developments after SALT I exceeded public expectations.

 d. The United States should seek to achieve and maintain military superiority over the Soviet Union.

 e. The U.S. defense budget should be substantially increased.

Though views such as these were held by many experts and by millions of Americans, we did not find a single one of them clearly reflected on CBS Evening News. (This point is elaborated in Chapter 7.) Such views were privately expressed within the councils of government, privately and publicly voiced by members of Congress, endorsed by national organizations, advanced by writers in national journals, and expressed by journalists, scholars, statesmen, and former military leaders.

. . . . .

4. Reasonable Opportunity Should Be Given For Opposing Views

It is abundantly clear that CBS Evening News failed to provide "a reasonable opportunity" for the presentation of "opposing views." The numerical neglect of opposing views, notably A positions, was compounded by the CBS practice of deprecating its sources of A views, especially in the interpretative reporting on Vietnam. This can be seen in the proper name analysis (Chapter 5) which shows that CBS usually turned to persons it had discredited for A views and to presumably authoritative sources for C views.

President Thieu, frequently portrayed as corrupt and repressive, was the chief CBS source of A views. Similar views held by distinguished theologians, scholars, and other competent persons were not cited. No A views from Congressional spokesmen were quoted. But in presenting C views, CBS Evening News quoted religious leaders, scholars, Senators, and Representatives. Sixteen of its own newsmen also expressed them.

The Fairness Doctrine requires that opposing views be expressed by persons of approximately equal status, authority, and respect. This means the broadcaster should actively seek out such persons in the interests of balance. Exact equivalence may not always be feasible, but the guideline is clear.

When Anthony Lewis of the *New York Times* was given 30 sentences to praise North Vietnam and criticize U.S. Vietnam policy, why did not CBS permit or seek another journalist of equal stature to express the opposite view? When Ramsey Clark was given 34 sentences to express C positions, why was not a comparable public figure given an approximately equal opportunity?

. . . . .

.

488

On the larger canvas, CBS Evening News did not provide adequate information on the central national security problems nor present fairly the options for dealing with them. CBS News did not call upon its vast resources of intellect and technology to clarify the consequential issues involved in SALT I and in other vital questions. We conclude, therefore, that CBS News failed in a substantial measure to fulfill the four requirements of the Fairness Doctrine. It also failed to meet the standards of the broadcasting codes. More important, CBS News shortchanged the American people and thus compromised its public trust.